[No. A093538. First Dist., Div. Five. Sept. 12, 2005.]

MILTON WISE et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II., III., and IV. of the Discussion.

726

728

## COUNSEL

Popelka-Allard, Bernard J. Allard, Joseph H. Ainley and Jeffrey Lochner for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Steven P. Burke; Severson & Werson and Jan T. Chilton for Defendant and Respondent.

## OPINION

**JONES, P. J.**—After plaintiffs/appellants instituted this action against Pacific Gas and Electric Company (PG&E) for unfair business practices (Bus. & Prof. Code, §§ 17200 et seq., 17500), violation of Public Utilities Code section 2106, and fraud, we applied the primary jurisdiction doctrine and imposed a stay of judicial proceedings in the trial court, pending an ongoing third party proceeding before the California Public Utilities Commission (PUC or Commission) that concerned similar issues, *Joanne Carey v. Pacific Gas and Electric Company.*[1]

The PUC closed the *Carey* proceedings without conducting a formal investigation of the conduct challenged by the *Carey* complainants. PG&E then brought a successful motion for judgment on the pleadings in the instant case on the grounds the trial court had lost subject matter jurisdiction as a result of the PUC decision to close its investigation in *Carey*. We will conclude the trial court erred in dismissing appellants' action.

---

[1] See *Joanne Carey v. Pacific Gas and Electric Company* (1998) 84 Cal. P.U.C.2d 196 (*Carey*), and *Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287 [91 Cal.Rptr.2d 479] (*Wise I*).

## BACKGROUND

I. *May 19, 1998 First Amended Complaint*

a. *Alleged Facts*

In their first amended, and operative, complaint, plaintiffs alleged generally:

PG&E is a utility regulated by the PUC that provides gas and electrical services to customers throughout California. It requires PUC approval of its rates for electricity and natural gas.

In January 1984, PG&E initiated a gas regulator replacement program (GRRP) to replace its old regulators because they were corroding and/or did not contain an internal pressure relief valve (IRV), making them susceptible to overpressurization, which could result in spontaneous gas leaks. PG&E contemplated replacing approximately $2 million domestic and small commercial establishment gas regulators over a seven-year period, 1984–1990.

At a 1986 general rate case proceeding before the PUC, PG&E represented that to complete the GRRP in seven years, it would have to actively categorize and designate all existing non-IRV regulators and send service personnel to each residence or commercial establishment to replace the premises' regulator. PG&E also represented that the annual cost of the GRRP from 1987 to 1990 would be $18 million, and the estimated cost from 1984 to 1990 would exceed $101 million. PG&E asked the PUC to allow a rate increase to reflect the GRRP costs it had already incurred as well as those it would incur between 1987 and 1989, representing that it would continue the GRRP and would replace approximately 260,000 regulators per year. Based on PG&E's representations, the PUC authorized an increase in PG&E's rate base to reflect the capital costs PG&E represented it would incur to complete the GRRP, and PG&E's rate-paying retail customers paid a rate for gas service and delivery that included the costs incurred by PG&E to carry out the GRRP.

In approximately June 1988 PG&E unilaterally ceased active replacement of the regulators. Since then it replaced non-IRV regulators only if a service call for another problem justified the presence of a PG&E technician at a residence or business and the call required shutting off the main gas line leading to the premises. Under this new "maintenance" program, only a nominal volume of old regulators would be replaced.

In subsequent rate proceedings, PG&E did not inform the PUC of its changes to the GRRP or that it was not incurring the costs it had previously represented it would incur. PG&E's internal documents suggested that its personnel were instructed not to disclose to the PUC that it had terminated its active GRRP unless PUC members specifically asked, and its specific company policy was to withhold information from the PUC regarding termination of the GRRP.

Through 1990, PG&E continued to "grossly underspend" the amount it represented to the PUC it would incur and the amount that was in fact reflected in PG&E's retail gas rates. As a result of its surreptitious termination of the GRRP, PG&E charged appellants and the general public $42,240,000 for services it failed to provide. Since 1988, it also continued to charge its ratepayers $1.1 million annually for the cost of its ongoing maintenance program, even though, as of 1990, it had already charged its ratepayers for replacement of every old regulator in its service area. Consequently, each annual charge for the ongoing maintenance program constituted a double recovery by PG&E.

### b. *Causes of Action*

The first amended complaint contains five causes of action: (1) violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.); and (2) false advertising (Bus. & Prof. Code, § 17500) (collectively, the UCL claims); (3) violation of Public Utilities Code section 2106 by violating the UCL; (4) fraud and deceit—concealment; and (5) fraud—negligent misrepresentation.

As to the UCL claims and related cause of action for violation of Public Utilities Code section 2106, appellants seek restitution and disgorgement of "any and all monies, including any profits" obtained by PG&E as a result of its "deceptive, unlawful and misleading business acts and practices, including its misrepresentation, misleading statements and acts of concealment" made to the PUC, and attorney fees (Code Civ. Proc., § 1021.5). In the common law fraud causes of action appellants seek compensatory and punitive damages.

### II. *Demurrer*

PG&E demurred on the grounds: (1) the court lacked subject matter jurisdiction because exclusive jurisdiction resided with the PUC, and (2) the complaint failed to state a cause of action because relief was barred by the

filed rate doctrine. (*Wise I, supra,* 77 Cal.App.4th at p. 292.) As to the fraud causes of action, PG&E also argued that class-wide reliance could not be proven, and plaintiffs failed to plead the elements of misrepresentation and reliance. (*Ibid.*)

Opposing the demurrer, plaintiffs argued, pursuant to *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918–919 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*), that the PUC does not have exclusive subject matter jurisdiction over the action because their action (1) does not contravene an order of the PUC, and (2) enforces rather than hinders PUC policy. (*Wise I, supra,* 77 Cal.App.4th at p. 292.) Plaintiffs also argued that because their claims do not involve ratemaking, the reasonableness of rates and/or tariffs, or the uniform application of the PUC's rates or regulatory statutes, the primary jurisdiction doctrine does not apply. (*Id.* at pp. 292, 293.) They further argued that the Public Utilities Code does not bar a UCL action, the filed rate doctrine was inapposite to this case, and the complaint stated prima facie claims for fraud and misrepresentation. (*Wise I, supra,* at pp. 292, 293.)

The trial court sustained PG&E's demurrer without leave to amend, and plaintiffs appealed.

### III. Wise I

■ In *Wise I*, plaintiffs contended that the trial court erroneously ruled that their action lay within the exclusive jurisdiction of the PUC. (*Wise I, supra,* 77 Cal.4th at p. 290.) We agreed. Citing *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161] and *Covalt, supra,* 13 Cal.4th at page 918, we observed that Public Utilities Code section 2106 authorizes a court to award damages in an action against a regulated utility for violation of any PUC order, but only in those situations in which the award would not hinder or frustrate the PUC's declared supervisory and regulatory policies or directly contravene a specific PUC order or decision. In the latter situations, the matter must be brought before the PUC, whose decisions are reviewable only by the appellate court. (*Wise I, supra,* at p. 294.) Given that plaintiffs' action claimed, in essence, that PG&E charged for services—replacing the old regulators—it failed to deliver, we held that its claim did not impede any supervisory or regulatory PUC policy. (*Id.* at p. 295.)

■ However, we also concluded that the primary jurisdiction doctrine was applicable to plaintiffs' action. (*Wise I, supra,* 77 Cal.App.4th at p. 300.) This doctrine " 'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the

special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 [6 Cal.Rptr.2d 487, 826 P.2d 730] (*Farmers Ins. Exchange*); quoting *United States v. Western Pac. R. Co.* (1956) 352 U.S. 59, 63–64 [1 L.Ed.2d 126, 77 S.Ct. 161], italics omitted.) The doctrine does not permanently foreclose judicial action, but it provides the appropriate administrative agency with an opportunity to act if it so chooses. (*Shernoff v. Superior Court* (1975) 44 Cal.App.3d 406, 409 [118 Cal.Rptr. 680].)

We concluded the primary jurisdiction doctrine was applicable after we granted PG&E's request to take judicial notice of *Carey, supra,* 84 Cal. P.U.C.2d 196, a PUC opinion and order that was filed after the demurrer in the instant case was sustained. (*Id.* at p. 197.)

In the *Carey* PUC complaint, Carey alleged that a 1996 explosion that destroyed an apartment complex undergoing a tented pest control fumigation was caused by the fumigator's improper shut off of the main gas valve and a faulty non-IRV regulator. (*Carey, supra,* 84 Cal.P.U.C.2d at p. 200.) Carey claimed that PG&E's policy of allowing untrained and inexperienced fumigation personnel, rather than PG&E personnel, to terminate the gas service during the fumigation caused the explosion and asked that PG&E be ordered to cease this policy immediately. (*Ibid.*) Other tenants of the same apartment complex intervened and alleged that PG&E fraudulently terminated the GRRP in 1988, and, had the GRRP continued, the faulty regulator would not have been in service during the fumigation. (*Id.* at p. 201.) They requested PUC to impose a $100 million fine against PG&E for unsafe conditions, based on the estimated cost of the 1984–1988 GRRP and on PG&E's savings in implementing the fumigation policy by which fumigation employees terminated gas service during fumigations. (*Id.* at p. 208.)

The prehearing "scoping memo"[2] in the *Carey* case identified the issues to be resolved in the proceeding as (1) Did PG&E commit unreasonable and/or any unsafe acts in 1996 by allowing a pest control fumigation contractor to terminate gas service at the apartment? (2) If an unsafe gas practice existed, should PG&E make changes to its gas termination or other gas procedures and if so, what changes? (3) Should PG&E be fined $100 million for any

---

[2] A scoping memo in a PUC proceeding is an order or ruling describing the issues to be considered in a proceeding and the timetable for resolving the proceeding. (Cal. Code Regs., tit. 20, § 5, subd. (m) (hereafter Regs.).)

proven unsafe practices or imprudent gas termination or other gas procedures followed during the 1996 explosion? (*Carey, supra,* 84 Cal.P.U.C.2d at pp. 198–199.) The scoping memo also ruled that, given the allegations and request for relief in the complaint, the parties could place relevant evidence in the record directing the PUC's Consumer Services Division to consider a future proceeding, to wit, an "Order Instituting Investigation" (OII)[3] into PG&E's gas termination and other gas practices. (*Carey,* at p. 199.)

The "Findings of Fact" in the PUC's December 1998 opinion in the *Carey* adjudicatory proceeding dealt primarily with PG&E's policy of having fumigators, not PG&E personnel, shut off gas service. (*Carey, supra,* 84 Cal.P.U.C.2d at pp. 207–209.) However, one finding stated that it was speculation to presume that the faulty valve that caused the 1996 explosion would have been replaced had PG&E continued the GRRP. (*Id.* at p. 209.) In "Conclusions of Law," the *Carey* opinion concluded that PG&E had engaged in unreasonable practices regarding its policy of allowing fumigator employees to terminate gas services and imposed a $976,800 penalty therefor. (*Id.* at pp. 209–210.)

In a part of the *Carey* opinion entitled "Future Proceedings," the PUC stated: "During the [GRRP] during 1984–1988, PG&E aggressively replaced 3/4 inch non-IRV gas regulators with those with internal relief. The seven-year program was ended after five years and replaced by a standard maintenance practice of replacing any size non-IRV gas regulator with an IRV gas regulator whenever it was necessary to turn the main service valve at any customer's premise. [Complainants] argue that PG&E misled and, in fact, lied to the Commission in order to terminate this program. [¶] In the Scoping Memo issued prior to the hearing, we ruled that the matter of fraudulent conduct . . . [was] outside the scope of the complaint proceeding and more appropriately decided in future proceedings, should staff at a later date recommend the institution of such proceedings. During the hearing, while we denied PG&E's motion to strike testimony of unethical conduct and misrepresentation to terminate the [GRRP], we admitted such testimony for the limited purpose of permitting the parties to complete the evidence of their

---

[3] An OII is initiated on the PUC's own motion and is a formal PUC proceeding. (Regs., tit. 20, §§ 4, subd. (a), 6, subd. (c)(1).) The OII is served on the entity being investigated, which need not file a responsive pleading unless so directed. (*Id.,* § 14.) It results in an adjudicatory proceeding that is an enforcement investigation into possible violations of any statute or PUC rule during which evidence is taken, briefs filed, argument presented, and, if needed, a hearing held, after all of which the proceeding stands submitted for decision by the PUC. If a hearing was held, the presiding officer issues a written decision. (*Id.,* §§ 6.1, subd. (a), 8.2.)

position on the allowable issues and to develop a record on the need for a future investigation into these allegations. . . . [¶] Now that we have heard this evidence and admitted certain relevant documents, the staff will be able to review this and any other evidence to determine whether an investigation of these and further issues should be opened." (*Carey, supra*, 84 Cal.P.U.C.2d at p. 207.)

The PUC ordered that remedies sought in the *Carey* complaint be granted in part, given the PUC's conclusion that PG&E engaged in unsafe practices by not revising policy regarding termination of gas services during fumigations and its assessment of a penalty therefor. (*Carey, supra*, 84 Cal.P.U.C.2d at pp. 209–210.) The order also directed the PUC's Consumer Services Division to advise the PUC "if an [OII] is needed to determine whether [PG&E] engaged in fraudulent conduct to terminate its [GRRP] and whether this program should be continued. . . . [Consumer Services Division] will make any recommendations to the [PUC] regarding these matters under the normal procedures." (*Id.* at p. 210.)[4]

Our *Wise I* opinion, issued in December 1999, concluded that the *Carey* opinion and order indicated that the PUC might be commencing the process of formulating a policy concerning the GRRP. (*Wise I, supra*, 77 Cal.App.4th at p. 298.) Consequently, we concluded the instant case was appropriate for application of the primary jurisdiction doctrine because "[a]ny action the PUC might take in the *Carey* proceeding concerning the GRRP will determine whether this action can or should be entertained by the court." (*Wise I, supra*, at p. 300.) Taking guidance from the Supreme Court's disposition in *Farmers Ins. Exchange, supra*, 2 Cal.4th, at pages 401, 402, we reversed and remanded "with directions to stay judicial proceedings and retain the matter on the court's docket pending further PUC proceedings" relevant to plaintiffs' claims "and to monitor the progress of the PUC proceedings to ensure against unreasonable delay of [plaintiffs'] action." (*Wise I, supra*, at p. 300.)

IV. *Post* Wise I *Proceedings*

a. *PUC Investigation*

Pursuant to the directive in the *Carey* order to advise the PUC whether an OII was needed on the questions reserved for "Future Proceedings"—

---

[4] On April 1, 1999, the PUC issued an order modifying its December 17, 1998 *Carey* opinion and order and denying PG&E's petition for a rehearing. (*Joanne Carey v. Pacific Gas and Electric Company* (1999) 85 Cal.P.U.C.2d 682.) Within 30 days after the PUC issues its decision on rehearing, any aggrieved party may petition for a writ of review in the Court of Appeal or the Supreme Court for a determination of the lawfulness of the PUC's decision. (Pub. Util. Code, § 1756, subd. (a).) None of the parties to the *Carey* complaint sought appellate review of the December 17, 1998 or April 1, 1999 orders.

questions of PG&E's fraudulent conduct in terminating the GRRP, its wrongful diversion of revenues from rates for the GRRP, and the continued existence of the GRRP—the PUC's Consumer Services Division engaged a consultant, JBS Energy, Inc. (JBS), to assist in the investigation of these questions.

On April 12, 2000, JBS issued its report, following its investigation in which it examined relevant documents and workpapers filed at the PUC in PG&E rate cases from 1984 onward, reviewed evidence presented in prior PUC cases and industry periodicals, studied PG&E's responses to its data requests, interviewed industry representatives, and obtained related governmental reports. Based on its examination of financial data, JBS concluded: (1) The allegation that PG&E underspent ratepayer funding for the GRRP was unfounded. PG&E did not receive funds significantly in excess of resources provided as to the GRRP, and (2) PG&E's allegation that it overspent on the GRRP by $11.7 million was exaggerated. Although it may have spent several million dollars more on the GRRP than it received in rates, this result occurred because the GRRP consisted of capital additions that were not forecast in advance in the 1984 rate case. "In essence," said the JBS report, "it appears . . . that the question of underspending vs. overspending is approximately a 'wash,' with PG&E possibly having spent a few million dollars more on the GRRP than it was given in rates."

JBS's report also listed four safety issues involving regulators and mini-pilots it had identified during its investigation.

On April 20, 2000, a PUC staff attorney informed plaintiffs' attorney that the PUC had not issued an OII of the GRRP, nor, as far as the PUC attorney was aware, did PUC have any present intention of doing so.

On June 19, 2000, the PUC president wrote to PG&E that JBS had submitted its report. "In furtherance of ascertaining the safety implications presented by termination of the expedited GRRP in 1988," the PUC president requested PG&E to undertake several studies and report the information obtained in these studies, in the form of a compliance filing, to the director of the PUC's consumer services division, the PUC's general counsel, and the chief of the PUC's utilities safety branch, and to make the studies and report available to the public, no later than September 27, 2000. The requested studies were prompted by the four safety issues identified in the JBS report. The PUC president copied her letter to the parties in the *Carey* proceedings and to the parties in the instant action.

By letter dated July 27, 2000, the PUC's general counsel informed the trial court that the PUC "recently voted to release the enclosed [JBS] report on PG&E's [GRRP]. . . .This is also to inform the Court and the parties [to the instant action] that the Commission does not believe there is good cause to further investigate whether PG&E diverted ratepayer funding or profited from its discontinuance of the GRRP. The Commission's investigation into the GRRP ratepayer funding issues raised [in the *Carey* case] is now closed." The general counsel copied his letter to the parties in the instant case and the parties in the *Carey* proceeding.

### b. *Reinstatement of Instant Action*

After the court and parties received the general counsel's July 27, 2000 letter, the court granted plaintiffs' motion to lift the stay on the instant action, made on the grounds the PUC, via the July 27 letter, had formally advised all parties that it had closed its investigation into the issues that formed the subject matter of plaintiffs' complaint.

### c. *Judgment on the Pleadings*

Following reinstatement of the instant action, PG&E moved for judgment on the pleadings on the grounds the court lacked jurisdiction to hear the case and that the first amended complaint did not state facts sufficient to constitute a cause of action. (Code Civ. Proc. § 438, subd. (c)(1)(B)(i) & (ii).) It argued that the PUC's action of closing its investigation of PG&E's possible diversion of ratepayer funding or profit from discontinuing the GRRP was binding on the trial court, given our observation in *Wise I* that "[a]ny action the PUC might take . . . concerning the GRRP will determine whether this action can or should be entertained by the court." (*Wise I, supra,* 77 Cal.App.4th at p. 300.) PG&E construed the phrase "will determine" as our charge that the PUC, not the court, would resolve the factual issue of whether PG&E underspent the rate increase it was granted for costs incurred in carrying out the GRRP.

PG&E also argued that plaintiffs' UCL causes of action are barred because "the relief plaintiffs seek—more than $50 million in alleged overcharges [is] for gas service they admit PG&E supplied." Consequently, there was no money or property to restore to them.

In opposing PG&E's motion for judgment on the pleadings, plaintiffs argued that the PUC's decision "not to act on the charges raised in [their] complaint," i.e., the PUC's decision to close its investigation of the GRRP,

had no res judicata or collateral estoppel effect on their case. They also argued that *Wise I* did not hold that the trial court could dismiss their action if the PUC did not act regarding the claims asserted in their complaint.

The court granted PG&E's motion without explanation and entered judgment in its favor.[5]

## DISCUSSION

### Standard of Review

■ A motion for judgment on the pleadings is akin to a general demurrer; it tests the sufficiency of the complaint to state a cause of action. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989 [94 Cal.Rptr.2d 643].) The court must assume the truth of all factual allegations in the complaint, along with matters subject to judicial notice. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720].) Appellate courts review judgments on the pleadings de novo. (*Stockton Newspapers, Inc. v. Redevelopment Agency* (1985) 171 Cal.App.3d 95, 99 [214 Cal.Rptr. 561].)

I. *The PUC's Decision to Close Its Investigation of the GRRP Ratepayer Funding Issues Raised in the Carey Case Does Not Preclude the Instant Action*

The parties agree that the principal issue is the effect on this case of the PUC's closing of its investigation into the GRRP ratepayer issues raised in the *Carey* case after it concluded that no further investigation of whether PG&E diverted ratepayer funding or profited from its discontinuance of the GRRP was warranted. Plaintiffs contend the trial court retained subject matter jurisdiction over their action because the PUC took no action regarding the GRRP and PG&E that would deprive the court from proceeding in the instant action. Specifically, they argue that a judicial proceeding in their action would not interfere with or contravene a specific PUC order or decision, or undermine a specific PUC general supervisory or regulatory policy because the PUC did not issue a definitive decision, regulation, or policy, or hold formal administrative hearings regarding the GRRP.

---

[5] Appellants' timely appeal was held in abeyance for approximately three years by the automatic stay in PG&E's chapter 11 bankruptcy case.

PG&E does not dispute that, pursuant to *Wise I*, the trial court had jurisdiction to proceed with the instant action after the PUC closed its investigation of the GRRP ratepayer funding issues raised in the *Carey* case. It contends that the PUC's closing of the investigation was a decision on the merits that has a binding effect on a collateral judicial proceeding, i.e., plaintiffs' action. It also appears to contend that, pursuant to *Wise I*, whatever kind of action the PUC took regarding the issue of PG&E's alleged fraudulent termination of the GRRP is determinative of plaintiffs' claims and would preclude further court action.

Neither the parties nor our research have discovered a California court opinion in a case that was reinstated in the trial court after an administrative agency, under the primary jurisdiction doctrine, was accorded the opportunity to deal with issues raised in the complaint. Thus, the issue of the effect of an administrative agency's action on the reinstated case following application of the doctrine appears to be one of first impression.[6]

■ Given the policy advanced by the doctrine—enhancement of court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise (*Farmers Ins. Exchange, supra,* 2 Cal.4th at p. 391)—the court which exercises its discretion to stay the judicial proceeding, pending agency proceedings, expects to be aided by the agency's decision. " '[E]ven if . . . ultimate resort to the courts [is] inevitable [citation], the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review.' " (*Id.* at p. 400, quoting *Westlake Community Hosp. v. Superior*

---

[6] Plaintiffs urge that *Shernoff v. Superior Court, supra,* 44 Cal.App.3d 406 is dispositive. In *Shernoff,* plaintiffs brought a class action for damages against numerous title insurers alleging conspiracy to fix title insurance rates. (*Id.* at p. 408.) Applying the primary jurisdiction doctrine, the trial court stayed the action to give the Insurance Commissioner the first opportunity to act on the rate-fixing allegations. (*Ibid.*) The commissioner subsequently informed the trial court that, "based on an 'investigation, review and analysis of [plaintiffs'] allegations' . . . he 'decided not to conduct a formal administrative hearing' " into the rate-fixing charges. (*Id.* at p. 409.) The Court of Appeal issued a writ compelling the trial court to vacate its stay. It reasoned that, insofar as the commissioner formally declined to exercise his primary jurisdiction, the stay had outlived its usefulness and the action could go forward. (*Id.* at pp. 409–410.) Similarly here, the PUC, after having its consumer services division conduct an informal investigation of PG&E's alleged fraudulent termination of the GRRP and diversion of ratepayer funding, decided not to conduct a formal hearing or other formal proceeding.

However, *Shernoff* differs from the instant case because it addressed only the vacation of the stay. Whether the trial court correctly resolved the merits of the action after the stay was lifted, and what use, if any, the trial court could make of the Commissioner's decision not to conduct a formal hearing were not issues before the *Shernoff* court.

*Court* (1976) 17 Cal.3d 465, 476 [131 Cal.Rptr. 90, 551 P.2d 410].) "Under [the] doctrine, a trial court may avail itself of the specialized expertise of an administrative agency before hearing a matter—the agency in effect becomes a kind of special master for the trial court." (*Miller v. Superior Court* (1996) 50 Cal.App.4th 1665, 1669 [58 Cal.Rptr.2d 584].)

However, while cases like *Farmers Ins. Exchange, supra,* 2 Cal.4th at pages 400, 401, refer to the "administrative proceeding" that will occur upon application of the primary jurisdiction doctrine, they do not precisely identify the kind of proceeding contemplated by the doctrine. Nor do they identify the nature of the administrative decision the doctrine contemplates will inform the subsequent judicial proceeding. We now address those questions.

### a. *Necessity of Administrative Ruling*

As *Farmers Ins. Exchange, supra,* 2 Cal.4th at page 386, observes, the doctrine of primary jurisdiction, sometimes known as the doctrine of prior resort or preliminary jurisdiction, originated in the United States Supreme Court and has since been developed largely in federal courts. Federal cases therefore provide assistance in resolving the issues we confront in this case.

The doctrine of primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling. [Citations.] Referral of the issue to the administrative agency does not deprive the court of jurisdiction; [the court] has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice. [Citations.]" (*Reiter v. Cooper* (1993) 507 U.S. 258, 268–269 [122 L.Ed.2d 604, 113 S.Ct. 1213], fn. omitted (*Reiter*).)

In *Reiter*, the petitioner, a shipper, sought damages for unreasonable tariff rates charged by a motor common carrier, an action expressly allowed by the Interstate Commerce Act (ICA). (*Reiter, supra,* 507 U.S. at p. 262.) *Reiter* noted that "referral" to the administrative agency should not be understood in the sense of advisory opinion. " 'Referral' is sometimes loosely described as a process whereby a court refers an issue to an agency. [Citation.] But the ICA (like most statutes) contains no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court merely staying its proceedings while the

shipper files an administrative complaint [with the Interstate Commerce Commission]. . . . Use of the term 'referral' to describe this process seems to have originated in [*United States v. Western Pacific R. Co.* (1956) 352 U.S. 59, 64 [1 L.Ed.2d 126, 77 S.Ct. 161]], which asserted that, where issues within the special competence of an agency arise, 'the judicial process is suspended pending referral of such issues to the administrative body for its views.' [Citation.] . . . *Mitchell Coal & Coke Co. v. Pennsylvania R. Co.* [(1913)] 230 U.S. 247, 267 [57 L.Ed. 1472, 33 S.Ct. 916] spelled out the actual procedure contemplated, holding that further action by the district court should 'be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a *ruling* as to the reasonableness of the practice. [Citation.]' " (*Reiter, supra,* at p. 268, fn. 3, italics added.)

■ Furthermore, the primary jurisdiction doctrine contemplates that the "ruling" issued by the agency is itself subject to judicial review. "When [primary jurisdiction is] properly invoked, . . . the doctrine requires that the suit be stayed until the agency resolves the issue, whereupon the lawsuit resumes if the agency's resolution (*assuming it survives review by whatever court has jurisdiction to review the agency's decisions*) has not resolved the entire controversy." (*Marseilles Hydro Power v. Marseilles Land & Water* (7th Cir. 2002) 299 F.3d 643, 651, italics added; accord, *Com. of Mass. v. Blackstone Valley Elec. Co.* (1st Cir. 1995) 67 F.3d 981, 993, & fn. 15: action to recover clean-up costs from electric company referred to the Environmental Protection Agency (EPA), and case stayed pending appropriate determination by the EPA (and any judicial review of its determination) of relevant issues.)

■ Like the ICA at issue in *Reiter*, the Public Utilities Act does not include a provision by which the court is authorized to request a determination from the PUC. The Public Utilities Act has a mechanism for judicial review of PUC decisions (Pub. Util. Code, § 1756). A fair reading of the act and the attendant PUC rules and regulations implies that the decisions subject to such review are those that issue after a vote by the Commission, or, in limited circumstances, by an administrative law judge. (Pub. Util. Code, § 311, subd. (d) & (g); Regs., tit. 20, § 77.7, subds. (a)(1) & (e).)

b. *Preclusive Effect of Ruling*

■ As in federal law, an agency decision, and specifically a PUC decision, is entitled to collateral estoppel effect in a subsequent judicial proceeding if the agency decision meets the test therefor. (*People v. Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321]; *People v. Western AirLines, Inc.* (1954) 42 Cal.2d 621, 630 [268 P.2d 723]; see also

*Ricci v. Chicago Mercantile Exchange* (1973) 409 U.S. 289, 306 [34 L.Ed.2d 525, 93 S.Ct. 573]; *United States v. Utah Constr. Co.* (1966) 384 U.S. 394, 422 [16 L.Ed.2d 642, 86 S.Ct. 1545].) Thus, the agency must have been acting in a judicial capacity; the issue before the agency must have been identical to the issue in the judicial proceeding; and the agency that resolved the disputed issue must have given the parties an adequate opportunity to litigate the issue. (*County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1120 [5 Cal.Rptr.3d 575]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1221 [61 Cal.Rptr.2d 447]; see also *United States v. Utah Constr. Co., supra,* 384 U.S. at p. 422.) Additionally, the issue must have been actually litigated, i.e., raised in pleadings or otherwise, submitted for determination, and determined (*Barker v. Hull* (1987) 191 Cal.App.3d 221, 226 [236 Cal.Rptr. 285]), and the party against whom it is asserted must have been a party, or in privity with a party, to the agency proceeding. (*Geoghegan v. Retirement Board* (1990) 222 Cal.App.3d 1525, 1531 [272 Cal.Rptr. 419].)[7]

c. *Application*

Application of the above principles permits the instant case to go forward, at least at this stage of the proceedings. In the first place, the PUC never issued a ruling on the issue of PG&E's possible fraud in discontinuing the GRRP. Its final April 1, 1999 order in the *Carey* proceeding simply directed its consumer services division to advise the Commission whether an OII was needed to determine whether PG&E engaged in fraudulent conduct when it terminated the GRRP. (*Carey, supra,* 84 Cal. P.U.C.2d at p. 210; see also *Carey, supra,* 85 Cal. P.U.C.2d at pp. 692–693.) Thereafter, the consumer services division conducted informal research and analysis of the issue. Insofar as the PUC never issued such an OII, the consumer services division inferentially advised the PUC that an OII was unnecessary.

Nor did the PUC issue a ruling or policy statement on the issue. To the extent it made a "decision," the most that can be inferred from the July 27, 2000 letter of its general counsel to the trial court is that it concluded no further investigation into PG&E's possible diversion of ratepayer funding or profit from discontinuing the GRRP was warranted and closed its investigation. There were no parties to this "decision," and it was not made by the

---

[7] Citing *Marine Terminal v. Rederi. Transatlantic* (1970) 400 U.S. 62, 71 [27 L.Ed.2d 203, 91 S.Ct.203] (*Marine Terminal*), PG&E comments that when the primary jurisdiction doctrine is applied, an agency's determinations may be held binding even on persons who were not parties to the administrative proceeding. PG&E's observation is misleading. *Marine Terminal* concluded that the defendant in a judicial proceeding was bound by an agency determination, even though it was not a named party in the preceeding agency proceeding, because it was represented at that hearing by its agent, and it had also made numerous claims at the administrative hearing to having party status.

PUC acting in an adjudicatory capacity. Certainly the plaintiffs in *Wise I*, who never participated in any PUC proceedings, were not parties. Finally, the PUC's action did not meet the statutory or PUC definition of decision: "any resolution or decision to be voted on by the Commission." (see Regs., tit. 20, § 77.7, subd. (a)(1); Pub. Util. Code, § 311, subd. (g)(1).)[8]

 Accepting for argument's sake that the general counsel's letter may reflect an "order" by the PUC to discontinue the investigation,[9] we observe that agencies commonly issue "orders" that have no independent coercive effect. (*Marine Terminal, supra,* 400 U.S. at p. 71.) Such so-called orders are "merely the formal record of conclusions reached after a study of data collected in the course of extensive research conducted by [the agency] through its employees. It is the exercise solely of the function of investigation." (*United States v. Los Angeles R. R.* (1927) 273 U.S. 299, 309–310 [71 L.Ed. 651, 47 S.Ct. 413].)[10] These orders are more accurately characterized as directives. However denominated, the PUC's decision to close the investigation does not constitute the kind of decision sufficient to have a preclusive effect on the instant action.

Relying on Public Utilities Code sections 1701, subdivision (a), 1701.1, subdivision (a), and 1701.2, subdivision (a), PG&E argues that the PUC's determination to close its investigation was conclusive in this collateral proceeding because the PUC may "dispose of adjudication cases" without holding a formal hearing or issuing a formal written opinion containing findings of fact and conclusions of law.

The sections on which PG&E relies are located in article 1, entitled "Hearings," of chapter 9, entitled "Hearings and Judicial Review of the Public Utilities Act." Public Utilities Code section 1701, subdivision (a), provides that all hearings, investigations, and proceedings before the PUC are governed by the Public Utilities Act (Pub. Util. Code, § 201 et seq.) "and by rules of practice and procedure adopted by the" PUC. It also provides that no

---

[8] According to the July 27, 2000 letter, the only vote taken by the PUC was to release the JBS report.

[9] The appellate record contains no writing from the Commission itself or any of its officers or members directing cessation of the investigation, nor does it contain minutes from a meeting of the Commission at which such a directive issued, or at which any vote was taken by the Commission.

[10] As *United States v. Los Angeles R. R., supra,* 273 U.S. 299 which involved a railroad and the Interstate Commerce Commission, observed, such an "order" "does not command the carrier to do, or to refrain from doing, [anything]; which does not grant or withhold any authority, privilege or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation." (*Id.* at pp. 309–310.)

order, decision or rule made, approved, or confirmed by the PUC shall be invalidated because of any informality in any hearing, investigation or proceeding. Public Utilities Code section 1701.1, subdivision (a), provides that the PUC shall determine whether a proceeding requires a hearing and whether the matter requires a quasi-legislative, adjudication or rate-setting hearing. Public Utilities Code section 1701.2, subdivision (a), provides that if the PUC determines that an adjudication case requires a hearing, a written decision is required. (Pub. Util. Code, § 1701.2.) An adjudication case, as PG&E characterizes the PUC's post-*Carey* decision to close the investigation of the GRRP ratepayer funding issues, is an enforcement case or complaint. (Pub. Util. Code, § 1701.1, subd. (c)(2).)

These statutes do not assist PG&E, as the PUC's rules and procedures, adopted pursuant to Public Utilities Code section 1701, subdivision (a), demonstrate. (Regs., tit. 20, §§ 1–87.) The proceedings for which a categorization is required—quasi-legislative, adjudication, or ratesetting—are identified by the rules as formal proceedings. (*Id.*, §§ 4, subd. (a), 5, subd. (a).) Formal proceedings are commenced by a third party application or complaint or a PUC OII. (*Id.*, § 6.) An adjudicatory proceeding is an enforcement investigation into possible violation of any provision of statutory law or PUC order or rule, or a complaint against a regulated entity. (*Id.*, § 5, subd. (b).) If no hearing was held in an adjudicatory proceeding, it "shall stand submitted for decision by the Commission after the taking of evidence, and the filing of briefs or the presentation of oral arguments as prescribed by the Commission or the presiding officer," and is subject to appeal. (*Id.*, § 8.2 subds. (a) & (c).)

Under the PUC's own rules, its conclusion that further investigation of the GRRP ratepayer funding issues was unnecessary was not the result of an "adjudicatory proceeding." There was no proceeding commenced by a complaint or OII, which in turn was followed by taking evidence, filing briefs and/or presenting oral argument, and weighing the evidence in conjunction with the arguments. It is not the absence of a hearing or written decision that causes the PUC's "determination" to close its investigation to lack preclusive effect; it is the absence of an adjudication prior to the "determination," with the attendant opportunity to present evidence and be heard, followed by the issuance of a PUC decision.

In *Wise I* we concluded that the instant case was appropriate for application of the primary jurisdiction doctrine because "[a]ny action the PUC might take [pursuant to the directive in the *Carey* order] concerning the GRRP will determine whether [the instant] action can or should be entertained by the court." (*Wise I, supra,* 77 Cal.App.4th at p. 300.) PG&E appears to construe this conclusion to mean that whatever the PUC chose to do or not do regarding the GRRP would be dispositive of the issues in the instant case.

However, such a construction would conflict with our first holding in *Wise I*: the PUC does *not* have exclusive jurisdiction over the issues raised in the instant action. (*Id.* at pp. 293–295.) The language of an opinion must be construed with reference to the facts of the case. (*Trope v. Katz* (1995) 11 Cal.4th 274, 284 [45 Cal.Rptr.2d 241, 902 P.2d 259].) Had we concluded the PUC should be the final arbiter of the issue of PG&E's possible fraud in conjunction with the GRRP, we would have held plaintiffs' action was barred by Public Utilities Code section 1759 and not applied the primary jurisdiction doctrine.

PG&E also argues the PUC determination was binding on plaintiffs even though they were never parties to a PUC proceeding because they were aware of the *Carey* order and its directive that the Consumer Services Division advise the PUC on the need for an OII, and they could have intervened or otherwise participated in the consumer services division's investigation. As *Wise I* made plain, plaintiffs were under no obligation to do so. Rather, we effectively told them to wait, to hold all proceeding in abeyance, until the PUC determined what course of action, if any, it would take concerning PG&E and the GRRP. PG&E's argument is, in essence, an argument that plaintiffs failed to exhaust their administrative remedies, which has as its underlying basis presumed exclusivity of PUC jurisdiction over their claims. *Wise I* rejected that argument.

## II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

 We conclude plaintiffs have stated valid causes of action against PG&E that are not precluded by the PUC's determination there was no good cause to investigate further whether PG&E diverted ratepayer funding or profited from its discontinuation of the GRRP and the closing of its investigation into the GRRP ratepayer funding issues raised in the *Carey* case, as expressed in the July 27, 2000 letter of the PUC's general counsel to the trial court. We express no opinion on the possible evidentiary use that can be made of the Commission's actions recited in this letter or of the JBS Energy report on further proceedings in this case. For the reasons discussed in the unpublished portion of this opinion, we also conclude plaintiffs have adequately pled a claim under Business and Professions Code section 17200 for restitution of personal losses and that plaintiffs are entitled to amend their UCL causes of action to comply with Proposition 64 requirements.

---

*See footnote, *ante*, page 725.

## DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion. Appellants shall recover costs on appeal.

Stevens, J., and Simons, J., concurred.

On September 19, 2005, the opinion was modified to read as printed above.