[No. B178729. Second Dist., Div. One. July 10, 2006.]

RICHARD K. GOTTLIEB, Plaintiff, Cross-defendant and Appellant, v. MICHAEL KEST, Individually and as Trustee, etc., Defendant, Cross-complainant and Respondent.

COUNSEL

Tesser & Ruttenberg and Brian M. Grossman for Plaintiff, Cross-defendant and Appellant.

Raymond L. Asher for Defendant, Cross-complainant and Respondent.

OPINION

MALLANO, J.—In this action, plaintiff alleged that defendant, a coparticipant in a real estate venture, breached the parties' agreement to fund the project, causing plaintiff to lose the deal. Defendant filed a cross-complaint against plaintiff and plaintiff's companies, contending they had fraudulently obtained funds from him to pursue the deal. Plaintiff answered the cross-complaint. But plaintiff's companies, which had no assets, defaulted. The ensuing default judgment recited that plaintiff had personally committed acts of fraud in securing funds from defendant.

The trial court granted summary judgment in favor of defendant on the complaint based on the doctrine of judicial estoppel, which protects the integrity of the judicial process by preventing a party from taking inconsistent positions in separate cases. In a prior bankruptcy case, plaintiff did not list any legal claims as assets, an omission seemingly at odds with the filing of this action. We conclude that, in accordance with the principles of judicial estoppel, the summary judgment must be reversed because the bankruptcy court did not adopt or accept the truth of plaintiff's omission, eliminating any threat to judicial integrity.

On the cross-complaint, the trial court entered judgment against plaintiff based on the doctrine of collateral estoppel, which precludes a party from relitigating issues actually decided in a prior proceeding. The trial court reasoned that the default judgment entered against plaintiff's companies precluded him from litigating his individual liability because he was in privity with them. Although a default judgment may have collateral estoppel effect in certain circumstances, there was no privity here because plaintiff's interests in defending the cross-complaint differed significantly from the interests of his companies, namely, the companies could not afford counsel and had no assets. Accordingly, we reverse the judgment on the pleadings.

# I

# BACKGROUND

On March 2, 2001, plaintiff Richard K. Gottlieb filed this action against Michael Kest, individually and as the trustee of the Kest Children's Trust (Trust). Kest later filed a cross-complaint against Gottlieb and others.

## A. *The Complaint*

On June 19, 1998, William Stoll entered into an agreement to buy 146 acres of raw land located in Las Vegas, Nevada, from Nevada Ready Mix Corporation. The purchase price for the property, known as the "Quarry," was around $5.5 million.

In October 1998, Gottlieb negotiated with Stoll to acquire Stoll's rights to the Quarry. Gottlieb formed a new company, RKG Acquisition, LLC (RKG), for that purpose. On November 4, 1998, Stoll and RKG entered into a written agreement conveying Stoll's rights in the Quarry to RKG. RKG negotiated a separate agreement with a different property owner to purchase a four-acre parcel adjacent to the Quarry.

In January 1999, Gottlieb had discussions with Kest to obtain funds to buy the Quarry. Kest indicated the Trust might be interested in providing the money. On or about January 20, 1999, the Trust loaned RKG and Gottlieb $125,000 in accordance with the terms of a promissory note. RKG and Gottlieb were to repay the loan, plus an additional $50,000, by March 22, 1999.

In February 1999, Gottlieb asked Kest to invest an additional $375,000 in the project. They orally agreed that if the Trust paid the additional amount: (1) the Trust would become an equal partner with Gottlieb in the Quarry project, each having a 50 percent ownership interest; (2) the Trust would provide 80 percent of the funds needed to proceed with the project—a minimum commitment of $1.3 million—and Gottlieb would provide the remaining 20 percent; and (3) the same percentages would govern the sharing of initial profits until each party recouped its investment, after which the profits would be distributed equally. This oral agreement, although considered by the parties to be binding, was to be memorialized in a written document. Before that was done, the Trust advanced the additional funds to RKG and Gottlieb.

On or about March 2, 1999, RKG and the Trust executed an "Assignment and Assumption of Assignment and Assumption of Purchase and Sale Agreement" (Assignment Agreement), which characterized the Trust's $125,000

and $375,000 payments as loans and assigned the Trust a 50 percent security interest in RKG's right to purchase the Quarry. The Assignment Agreement extended the maturity date of the promissory note to April 15, 1999, and recited that RKG and Gottlieb were jointly and severally liable on both loans. It further stated that if the parties did not reach an agreement by April 15, 1999, regarding how to proceed with the Quarry venture, the Trust could serve written notice within three days, either requiring repayment of the $375,000 loan or realizing on its 50 percent security interest.

Thereafter, the Trust made three more payments to RKG and Gottlieb: $150,000 on March 25, 1999; $125,000 on April 14, 1999; and $25,000 on April 26, 1999. Each payment was acknowledged by a written amendment to the Assignment Agreement, reflecting that the "$375,000 Loan is hereby revised to include the additional [payment]." The amendments also provided that the Assignment Agreement, except as so modified, was to remain in effect. With the last of these payments, the Trust had paid RKG and Gottlieb a total of $800,000, consisting of the amounts paid under the promissory note and the Assignment Agreement.

From April 1999, continuing into the summer of 1999, Gottlieb and the Trust exchanged documents that confirmed the terms of the oral agreement, but they never signed anything formal. The Trust did not give notice under the Assignment Agreement that the $375,000 loan (as increased by amendment) was to be repaid. As a result, Gottlieb believed that the Trust was his 50 percent partner in the Quarry project notwithstanding the lack of formal documentation.

During the summer of 1999, Gottlieb requested several times that the Trust advance additional funds for the project. In or about August 1999, the Trust refused to honor its agreement to advance up to 80 percent of the necessary funds. The loss of the project became imminent.

On August 31, 1999, RKG filed a petition under chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 et seq.; chapter 11) in the United States Bankruptcy Court for the Central District of California (*In re RKG Acquisition LLC* (U.S. Bankr. Ct., C.D.Cal., 1999, No. LA-99-42501-ER)). RKG instituted the bankruptcy proceedings in an attempt to gain time to obtain the funds needed to preserve the Quarry project. Because the Trust did not provide adequate funds for the project, and RKG was not able to secure funds elsewhere, RKG's rights in the Quarry eventually lapsed.

Meanwhile, Kest and Stoll had been negotiating directly with each other. They had agreed that Kest would not provide RKG with the promised funds, and, upon RKG's loss of the Quarry, Kest would enter into a separate deal

with Stoll to acquire the property. After RKG's rights in the project lapsed, Kest entered into an agreement with Stoll to purchase an interest in the Quarry without RKG's participation. Kest acquired either actual or beneficial title to the Quarry or the right to receive proceeds from the sale of the Quarry. He ultimately received profits in excess of $4 million from the project.

As stated, Gottlieb filed the complaint on March 2, 2001. He alleged that, by assignment, he held all of RKG's rights, title, and interest in the Quarry. The complaint contained five causes of action: breach of contract, fraud, unjust enrichment, resulting trust, and constructive trust. The contract claim, against Kest in his capacity as trustee, alleged that the Trust had breached the oral agreement to provide 80 percent of the Quarry funds and the minimum $1.3 million. The fraud claim, against Kest individually and as trustee, alleged that Kest entered into the oral agreement on behalf of the Trust without intending to perform it. The claim for unjust enrichment, also against Kest in both capacities, alleged that the Trust had improperly acquired the Quarry to Gottlieb's exclusion. The claims for resulting trust and constructive trust sought to protect Gottlieb's 50 percent share of the proceeds from the project. Gottlieb sought to recover lost profits, estimated to exceed $2 million.

On April 24, 2001, Kest, individually and as trustee, filed an answer to the complaint, generally denying all allegations. (See Code Civ. Proc., § 431.30, subd. (d).)

B. *The Cross-complaint*

Kest filed a cross-complaint, on behalf of himself and the Trust, against Gottlieb, RKG, and RKG Holdings, Inc. (RKG Inc.), alleging four causes of action for fraud (Civ. Code, § 1710, subds. 1–4), among others.

The cross-complaint alleged that Gottlieb, individually and on behalf of his two companies, had obtained $800,000 from the Trust by falsely telling Kest: (1) RKG had already obtained the necessary funding to close escrow on the Quarry but needed cash to extend the closing deadline; (2) Gottlieb had invested $325,000 in the deal; (3) Gottlieb would provide proof of his $325,000 investment; and (4) all sums advanced by the Trust would be used in connection with the Quarry project. Kest sued RKG Inc., the holding company, because the funds loaned under the Assignment Agreement were paid directly to it.

Gottlieb filed an answer to the cross-complaint, generally denying all allegations. (See Code Civ. Proc., § 431.30, subd. (d).) RKG and RKG Inc. did not file a response, and the clerk of court entered their default. Kest filed

a request for default judgment and supporting papers. The matter came on for hearing in the trial court. No appearance was made on behalf of the companies.

The trial court entered a default judgment against RKG and RKG Inc. The judgment recited that Gottlieb was the president and sole shareholder of RKG Inc. Gottlieb and RKG Inc., in turn, were the only members of RKG, with Gottlieb having a 99 percent interest in RKG, and RKG Inc. having a 1 percent interest. Gottlieb had knowingly made false statements to induce the Trust to loan him and his companies $800,000. In particular, Gottlieb had made the statements alleged in the cross-complaint, knowing: (1) he and RKG lacked the funding to close escrow on the Quarry, nor had they arranged for financing to close escrow; (2) he had not invested $325,000 of his own money in the deal; (3) an accurate accounting of his purported investment would not be provided to the Trust; and (4) he intended to use $300,000 of the $800,000 to cover personal expenses such as credit card bills and the cost of relocating to new offices. RKG and RKG Inc. ratified Gottlieb's fraudulent acts by accepting and retaining the benefits of his conduct.

The default judgment set forth the evidence supporting each element of the fraud claims and declared that RKG and RKG Inc. were jointly and severally liable for the amount of the loans, $800,000, plus interest at 10 percent per annum. No appeal was taken.

C. *Motion for Summary Judgment (Judicial Estoppel)*

On December 17, 2001, Kest filed a motion seeking summary judgment on the complaint, arguing that Gottlieb's claims were barred by the doctrines of judicial and equitable estoppel. Gottlieb filed opposition papers.

The motion asserted that RKG's bankruptcy papers contained statements that were inconsistent with the positions Gottlieb took in this action. For example, in the bankruptcy case RKG treated the $800,000 from the Trust as a debt (loan) and the Trust as a creditor (lender), while in this action the $800,000 was alleged to be equity (a capital contribution) and the Trust an investor (partner). The bankruptcy papers also failed to list as an asset RKG's legal claim against the Trust for allegedly breaching the oral agreement to provide 80 percent of the funds for the Quarry project. The evidence on the motion showed the following.

1. *Evidence Supporting Summary Judgment*

As RKG's managing member, Gottlieb had signed the bankruptcy papers—including the petition, debtor's schedules, summary of schedules, and statement of financial affairs—under penalty of perjury. Gottlieb brought this

action as RKG's assignee, having acquired all of RKG's rights, title, and interest in the Quarry. He did not have any personal rights in the project other than as an assignee.

One of the bankruptcy schedules, "Schedule A—Real Property," instructed, "list all real property in which the debtor has any legal, equitable, or future interest." In response, RKG identified the Quarry by description: "148 acres of real estate, Las Vegas, Nevada (Nevada Ready Mix [Corporation] property) . . . ."[1] RKG described its interest in the Quarry as an "Option to purchase" having a current market value of $12 million and an option price of $5,586,000. Elsewhere in the schedules, RKG listed its option agreement with Nevada Ready Mix Corporation as an executory contract.

On "Schedule B—Personal Property," RKG was required to "list all personal property of the debtor of whatever kind" with the exception of executory contracts and unexpired leases. Item 20 on the schedule stated that RKG was to list "contingent and unliquidated claims of every nature, including . . . counterclaims of the debtor"; RKG answered, "None." RKG also indicated it had $750,000 on deposit in an escrow account at Nevada Title Company for the purchase of the Quarry. RKG stated it did not have any "Accounts Receivable" or any "Interests in partnerships or joint ventures."

On "Schedule F—Creditors Holding Unsecured Nonpriority Claims," RKG listed Kest Investment Company as a creditor with a claim worth $800,000. RKG did not state whether the claim was disputed or undisputed. The claims of 16 other creditors were also listed. RKG did not list any contract with the Trust or Kest Investment Company as an executory contract on the appropriate schedule.

The *nonpriority* claims of all *unsecured* creditors came to $929,474.97. RKG stated it had no creditors with unsecured *priority* claims and no *secured* creditors. It listed $929,474.97 on the summary of schedules as the total amount of its liabilities.

On the statement of financial affairs, RKG stated it did not hold or control any property owned by another person. It also answered, "None," when asked to "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case." In response to an instruction that "[i]f the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership," RKG responded, "None."

---

[1] The complaint alleged that the Quarry consisted of 146 acres.

On or about September 2, 1999, RKG served a "Notice of Automatic Stay" on creditors, stating that title 11, section 362(a) of the United States Code provided "an automatic stay against: [¶] . . . [¶] . . . Any act to collect, assess, or recover a claim against the Debtor that arose before the commencement of the case under the Bankruptcy Code." The notice also stated: "The automatic injunction granted by § 362(a) will remain in effect until the bankruptcy case is dismissed or until such earlier times as set forth in [the] Bankruptcy Code . . . ."

On October 29, 1999, Nevada Ready Mix Corporation and RKG lodged a "Stipulation and Order re Relief from Stay" with the bankruptcy court. The stipulation recited that Stoll had entered into a "Purchase Agreement" with Nevada Ready Mix to buy the Quarry; the closing deadline under the agreement had been extended to August 31, 1999; Stoll had sold his purchase rights to RKG with Nevada Ready Mix's approval; when RKG failed to deposit the necessary funds into escrow 48 hours before August 31, 1999, Stoll notified RKG he was terminating RKG's right to purchase the Quarry; and Stoll then assigned his right to purchase the Quarry to Stoll Management Group, Inc. (Stoll Management), which filed a Chapter 11 bankruptcy case of its own.

The stipulation further provided: "RKG contends that its interests in the Purchase Agreement are still valid, that [Stoll's] notice of termination was not valid or enforceable and that neither Stoll or [Stoll Management] ha[s] any interest in the contract."

In the stipulation, RKG and Nevada Ready Mix agreed that RKG had to circulate its plan of reorganization by December 7, 1999, file its plan by December 22, 1999, and obtain court approval of its plan by March 1, 2000. If RKG failed to meet any of these deadlines, its rights and interests under the Purchase Agreement would automatically terminate, the Quarry would no longer be part of RKG's estate, and Nevada Ready Mix would retain ownership of or otherwise deal with the property, free of any rights or interests of RKG.

On November 4, 1999, the bankruptcy judge signed the stipulation, decreeing, "It is so Ordered." The same day, the stipulated order was filed and entered by the clerk of the bankruptcy court.

RKG did not circulate a reorganization plan by the deadline. On January 4, 2000, the bankruptcy court dismissed the case.

On January 15, 2000, Gottlieb executed an "Assignment," stating that RKG's bankruptcy case had been dismissed; RKG's only possible assets were

"legal claims"; RKG's single purpose—to purchase the Quarry—no longer existed; RKG desired to distribute any rights, title, and interests to its members; and in exchange for valuable consideration, including the release of debt, RKG was distributing 100 percent of its assets to each of its members in the same percentage as their ownership of the company. Gottlieb therefore received 99 percent of RKG's assets, and his solely owned corporation, RKG Inc., received the other 1 percent.

### 2. *Evidence Opposing Summary Judgment*

Before RKG filed its bankruptcy petition, Kest and Kest's attorney had told Gottlieb in several letters to repay the Trust's $800,000. Gottlieb personally believed the $800,000 "had been advanced for an equity position in the Quarry project," and the "Trust was only entitled to a 50% interest in the . . . project." But based on advice from bankruptcy counsel, Gottlieb decided to list the $800,000 as a "potential contingent liability" on the bankruptcy schedules because "there was . . . some concern that in litigation, a possibility existed that the $800,000 was due back to the . . . Trust." It was Gottlieb's understanding that "even though [he] did not believe [he] owed the money[,] . . . [he] should list any potential creditor in bankruptcy." Gottlieb, an attorney licensed in Illinois, had never practiced law.

Gottlieb's belief that the Trust was not owed anything was based in part on written communications with Kest. In April 1999, more than four months before the bankruptcy filing, Gottlieb prepared and signed a "Memorandum of Understanding" (MOU) and sent it to Kest for signature. The MOU stated RKG, Gottlieb, and the Trust were in agreement that the Trust would become a 50 percent owner of RKG and an equity partner with Gottlieb in the Quarry project. The Trust would contribute 80 percent of the capital for the project, that is, around $1.3 million, and Gottlieb would contribute 20 percent. The MOU also contained provisions for dividing profits and losses. Kest never signed the MOU.

During May 1999, Kest and Gottlieb, through their respective counsel, exchanged a series of letters proposing the terms of an "Operating Agreement," which set forth how they would manage RKG. Kest wanted to ensure he had equal rights with Gottlieb to manage RKG; otherwise—as Kest put it—he would be "risk[ing] his investment." An operating agreement was never signed.

By letter dated June 1, 1999, Kest's attorney requested that Gottlieb provide "real property security" to protect the Trust's "investment" in the Quarry should escrow not close as scheduled. In the alternative, the letter asked that Kest be accorded "full involvement" in all decisions regarding the escrow.

By another letter of the same date, Kest's attorney wrote to Nevada Title Company, stating that the Trust was an "investor" in RKG and should be sent copies of all documents relevant to the Quarry escrow. Kest's attorney wrote the title company again three days later, attaching the MOU as "proof" that the Trust "is a 50% owner of RKG." The letter also requested that "escrow instructions purportedly in the name of RKG" not be honored unless jointly signed by Kest and Gottlieb.

Because Kest never signed the MOU or any similar agreement, Gottlieb concluded, after discussions with bankruptcy counsel, that the Trust was not a part owner of RKG. He also believed that RKG owned 100 percent of the rights to purchase the Quarry property, but the Trust was entitled to a 50 percent interest in the proceeds from the project.

According to Gottlieb, the only reason RKG filed for bankruptcy was to "preserve its asset, i.e., 'the Quarry project.' " At the hearing on the summary judgment motion, Gottlieb's attorney confirmed that RKG initiated bankruptcy proceedings "[t]o get enough time to try to find another lender." When that effort failed, RKG dismissed the bankruptcy case. No plan of reorganization was submitted.

### 3. The Trial Court's Ruling

The motion for summary judgment was heard on January 14, 2002. After counsel presented argument, the trial court took the matter under submission. By minute order dated January 17, 2002, the trial court granted the motion, concluding that under *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171 [70 Cal.Rptr.2d 96] (*Jackson*)—a decision by this division—the action was barred by judicial estoppel.

Later, the trial court filed a formal "Order and Summary Judgment on the Complaint." The order explained that Gottlieb had taken inconsistent positions in two cases: In the bankruptcy case he did not list any legal claims as assets on RKG's schedules, and later, as RKG's assignee, he sought to recover on such a claim by filing this action. Further, the bankruptcy court had adopted or accepted the truth of Gottlieb's prior position, as evidenced by the automatic stay and the stipulated order.

After the granting of summary judgment, Gottlieb filed for personal bankruptcy under chapter 7 of the Bankruptcy Code (11 U.S.C. § 701 et seq.; chapter 7) (*In re Richard K. Gottlieb* (U.S. Bankr. Ct., C.D.Cal., 2002, No. LA-02-14274-ER)). RKG and RKG Inc. also filed Chapter 7 petitions (*In re RKG Acquisition LLC* (U.S. Bankr. Ct., C.D.Cal., 2002, No. LA-02-43992-ER); *In re RKG Holdings, Inc.* (U.S. Bankr. Ct., C.D.Cal.,

2002, No. LA-02-43985-ER)). Proceedings in the present action were delayed pending resolution of the Chapter 7 cases.[2]

At one point, trial was scheduled on the cross-complaint. Gottlieb discharged his trial counsel and filed a substitution of attorney form, electing to proceed in propria persona. Gottlieb requested a continuance of the trial so he could retain new counsel. Trial was continued for about four months. Kest later filed a dispositive motion as to the cross-complaint.

### D. *Motion for Judgment on the Pleadings (Collateral Estoppel)*

On July 21, 2004, Kest filed a motion for judgment on the pleadings and a request for judicial notice, seeking to establish Gottlieb's liability on the fraud claims in the cross-complaint.

The motion contended that, under the doctrine of collateral estoppel, Gottlieb was bound by the "findings" in the default judgment entered against RKG and RKG Inc. The motion relied in part on a declaration executed by Gottlieb in his Chapter 7 case that stated: (1) he "owned and control[led]" RKG and RKG Inc.; (2) both companies had ceased operations upon the demise of the Quarry project; and (3) "if Mr. Kest wishes to proceed to judgment against [the companies], such an action will be by way of default, since neither has resources to retain counsel, and, in any event, have no assets to satisfy any judgment." Gottlieb filed written opposition to the motion.

At the hearing on the motion, Gottlieb's counsel stated: "Mr. Gottlieb is not the same party as the corporate defendants, nor is he in privity with those defendants . . . . [¶] . . . He is the principal of those corporate defendants . . . . There is a distinct corporate entity different from the principal. [¶] . . . [¶] Mr. Gottlieb . . . made a decision that these corporate defendants had no assets and were not worth defending. A holding of collateral estoppel against Mr. Gottlieb would mean that he would have had . . . to defend these corporate defendants in order to protect his own personal liability."

The trial court granted the motion, concluding that privity existed on the theory that Gottlieb "owned, directly or indirectly, 100% of both [cross-defendant] entities and was their managing member and president." Judgment was entered against Gottlieb for the amount of the loans, $800,000, plus interest at 7 percent per annum. Gottlieb appealed.

---

[2] Chapter 7, entitled "Liquidation," permits a debtor's property to be sold and the proceeds distributed to creditors, resulting in a discharge of debts, while Chapter 11 provides a mechanism for a debtor to be reorganized in the hope of becoming profitable. (See generally 1 Collier on Bankruptcy (15th ed. 2006) ¶¶ 1.03[2][a] to 1.03[4][d], pp. 1-38 to 1-56.10.)

## II

## DISCUSSION

 In applying judicial estoppel, courts routinely inquire whether the party to be estopped *successfully* asserted an inconsistent position in a prior case. Here, the bankruptcy court did not adopt or accept the truth of Gottlieb's position that RKG did not have any legal claims. Neither the automatic stay nor the stipulated order constituted prior success. And the bankruptcy case was dismissed without confirmation of a plan of reorganization. In these circumstances, the trial court erred in barring the complaint under principles of judicial estoppel.

In ruling that collateral estoppel precluded Gottlieb from litigating his individual liability on the fraud claims, the trial court determined he was in privity with his defaulted companies because he controlled them. On the contrary, privity did not exist because Gottlieb's companies did not adequately represent his interests in defending the cross-complaint. They could not afford counsel and had no assets. Accordingly, Gottlieb's individual liability was not established by the default judgment.

### A. *Motion for Summary Judgment (Judicial Estoppel)*

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" ' "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence.' " (*Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 901 [32 Cal.Rptr.3d 373].)

 " 'Judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, prevents a party from "asserting a position in a

legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. . . ." ' . . . It is an ' "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." ' " (*Daar & Newman v. VRL International* (2005) 129 Cal.App.4th 482, 490–491 [28 Cal.Rptr.3d 566].)

In California, courts consider five factors in determining whether to apply judicial estoppel: "The doctrine [most appropriately] applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986–987 [12 Cal.Rptr.3d 287, 88 P.3d 24] (*Aguilar*), quoting *Jackson, supra,* 60 Cal.App.4th at p. 183; accord, *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 [30 Cal.Rptr.3d 755, 115 P.3d 41] (*MW Erectors*).)

"[C]ourts have uniformly recognized that [the] purpose [of judicial estoppel] is 'to protect the integrity of the judicial process.' " (*New Hampshire v. Maine* (2001) 532 U.S. 742, 749 [149 L.Ed.2d 968, 121 S.Ct. 1808, 1814] (*New Hampshire*); accord, *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 826–827 [39 Cal.Rptr.3d 189]; *Jackson, supra,* 60 Cal.App.4th at p. 181.) The doctrine is " 'aimed at preventing fraud on the courts.' . . . [It] ' " 'is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process . . . . "The policies underlying preclusion of inconsistent positions are 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings.' " . . . Judicial estoppel is "intended to protect against a litigant playing 'fast and loose with the courts.' " ' " . . . "It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite." ' " (*M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 463 [3 Cal.Rptr.3d 563].)

■ Judicial estoppel also " ' "protect[s] parties from opponents' unfair strategies" ' " (*Aguilar, supra,* 32 Cal.4th at p. 986) and "targets . . . unfairness between individual parties" (*MW Erectors, supra,* 36 Cal.4th at p. 424). Even so, the doctrine is primarily concerned with the connection between a party and the judicial system, not the relationship between the parties. (See *International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 350–351 [75 Cal.Rptr.2d 178]; *Jackson, supra,* 60 Cal.App.4th at p. 183; *Montrose Medical Group v. Bulger* (3d Cir. 2001)

243 F.3d 773, 779 & fn. 3 (*Montrose Medical Group*); *In re USinternetworking, Inc.* (Bankr. D.Md. 2004) 310 B.R. 274, 282; *In re Whitefoot* (Bankr. N.D.Miss. 2004) 306 B.R. 563, 566.)

Thus, a litigant seeking to invoke judicial estoppel typically is not required to make a showing of privity or detrimental reliance. (See *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1015–1016 [79 Cal.Rptr.2d 544]; *Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 151 [53 Cal.Rptr.2d 336], overruled on another point in *Lovejoy v. AT&T Corp.* (2001) 92 Cal.App.4th 85, 92–94 [111 Cal.Rptr.2d 711]; *Jethroe v. Omnova Solutions, Inc.* (5th Cir. 2005) 412 F.3d 598, 600; *Burnes v. Pemco Aeroplex, Inc.* (11th Cir. 2002) 291 F.3d 1282, 1286, followed in *Transamerica v. Institute of London Underwriters* (11th Cir. 2005) 430 F.3d 1326, 1335; *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.* (3d Cir. 1996) 81 F.3d 355, 358–361 (*Ryan Operations*); *Autos, Inc. v. Gowin* (D.Kan. 2005) 330 B.R. 788, 794 & fn. 2.)

"[N]umerous courts have concluded . . . that '[w]hile privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required.' " (*Burnes v. Pemco Aeroplex, Inc., supra,* 291 F.3d at p. 1286.) As we have stated: " 'The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts the *judicial machinery*.' " (*Jackson, supra,* 60 Cal.App.4th at p. 183, italics added; see *id.* at pp. 182–183 [contrasting judicial estoppel with collateral estoppel and equitable estoppel].)

We do not suggest that there are "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." (*New Hampshire, supra,* 532 U.S. at p. 751; see *ibid.* [judicial estoppel may be more appropriate in cases involving "unfair detriment"].) Further, given that "judicial estoppel is an equitable doctrine, . . . its application, even where all necessary elements are present, is discretionary." (*MW Erectors, supra,* 36 Cal.4th at p. 422, italics omitted.) Because of its harsh consequences, the doctrine should be applied with caution and limited to egregious circumstances. (See *Commonwealth Ins. Co. v. Titan Tire Corp.* (7th Cir. 2004) 398 F.3d 879, 888; *Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 511 [85 Cal.Rptr.2d 352]; *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 118 [113 Cal.Rptr.2d 915].)

### 1. *Duty of Disclosure in Bankruptcy Cases*

█ The Bankruptcy Code and rules require a debtor to file various "schedules," including a "schedule of assets." (See 11 U.S.C. § 521(a)(1)(B)(i),

(ii), former § 521(1); Fed. Rules Bankr.Proc., rule 1007(b)(1).) The rules require that the schedules be "prepared as prescribed by the appropriate Official Forms." (Fed. Rules Bankr.Proc., rule 1007(b)(1).) Official form 6, which governs personal property, requires a debtor to list "all personal *property* of the debtor of whatever kind," including "contingent and unliquidated *claims* of every nature [and] . . . counterclaims." (Collier on Bankruptcy, *supra*, appen. vol. A, pt. 2(d), at pp. 465, 466, item 21 (former item 20), italics added.) "Property" of a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of the case." (11 U.S.C. § 541(a)(1), (7).) "Claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." (*Id.*, § 101(5)(A).)

Under Chapter 11, a debtor has a continuing duty to notify the bankruptcy court of its assets by, for example, amending its schedules or including the assets on subsequently filed documents. (See 11 U.S.C. §§ 541(a)(1), (7), 1123(a)(1)–(5), 1125, 1129, 1141(d)(1)(A); Fed. Rules Bankr.Proc., rule 1009(a); *Billmeyer v. Plaza Bank of Commerce* (1995) 42 Cal.App.4th 1086, 1089–1090, 1094–1095 [50 Cal.Rptr.2d 119] (*Billmeyer*) [Chapter 11 case converted to Chapter 7 case]; *Ryan Operations*, *supra*, 81 F.3d at pp. 361–362; *Spann v. DynCorp Technical Services, LLC* (M.D.Ala. 2005) 403 F.Supp.2d 1082, 1086, 1089; *In re Wakefield* (Bankr. N.D.Tex. 2004) 312 B.R. 333, 338.)

"[T]he Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims.* . . . '. . . [A] debtor is required to disclose *all potential causes of action.*' . . . ' "The debtor need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed." ' . . . '*Any claim with potential must be disclosed,* even if it is "contingent, dependent, or conditional." ' " (*In re Coastal Plains, Inc.* (5th Cir. 1999) 179 F.3d 197, 207–208, citations omitted, second italics added.) Debtors are not required to "list hypothetical claims that are so tenuous as to be fanciful." (*Krystal Cadillac-Olds GMC Truck v. General Motors* (3d Cir. 2003) 337 F.3d 314, 323.)

While state law determines the existence of a claim, " 'the question of *when* a [claim] arises under the bankruptcy code is governed by federal law.' " (*In re Cool Fuel, Inc.* (9th Cir. 2000) 210 F.3d 999, 1006, italics added.) The federal courts apply four different tests, depending upon the type of fact pattern, to determine when a claim arises.

First, the "accrual" (or right to payment) test provides that a claim arises when a cause of action accrues under state law or other nonbankruptcy law. (*Matter of M. Frenville Co., Inc.* (3d Cir. 1984) 744 F.2d 332, 334–337; *In re Hassanally* (Bankr. 9th Cir. 1997) 208 B.R. 46, 50–51.) Of course, depending on the theory of liability, a cause of action may not accrue under state law until the plaintiff actually knows of an injury and its cause or, through reasonable diligence, could have discovered the injury and its cause. (*In re Hassanally, supra*, 208 B.R. at pp. 50, 54.) The Ninth Circuit and most other federal courts have rejected the accrual test because it defines a claim more narrowly than intended by Congress; for instance, it excludes a cause of action that is not yet cognizable. (See *id.* at p. 51; *In re Cool Fuel, Inc., supra*, 210 F.3d at p. 1006; *Butler v. NationsBank, N.A.* (4th Cir. 1995) 58 F.3d 1022, 1028–1029.) The test still applies in the Third Circuit, its circuit of origin. (See *In re Dean* (Bankr. W.D.Pa. 2004) 317 B.R. 482, 485–486.)

Second, under the "conduct" test, a claim arises when the wrongful conduct occurs even if the resulting injury has not yet become manifest. (*In re Hassanally, supra*, 208 B.R. at p. 51; *In re Parks* (Bankr. E.D.Mich. 2002) 281 B.R. 899, 902.) The conduct test has been criticized for defining claims too broadly. (*Epstein v. Official Comm. of Unsecured Creditors* (11th Cir. 1995) 58 F.3d 1573, 1576–1577.) "[M]any courts have taken the view that the conduct test may be overly broad, tending to include the claims of parties such as classes of future mass tort claimants who cannot know prepetition that they may have a claim in the future." (*In re Agway, Inc.* (Bankr. N.D.N.Y. 2004) 313 B.R. 31, 42.)

Third, the "relationship" test, which often governs claims against a manufacturer of defective products, focuses on the wrongdoer's prepetition conduct and the creation of a relationship, such as contact, exposure, impact, or privity, between the wrongdoer and the claimant. (See *In re Hassanally, supra*, 208 B.R. at p. 52.) A claim arises for purposes of the bankruptcy estate if, no later than the confirmation of a reorganization plan, a relationship exists between an identifiable claimant or group of claimants and the wrongdoer's prepetition conduct. (*Ibid.*; *Epstein v. Official Comm. of Unsecured Creditors, supra*, 58 F.3d at p. 1577.)

Fourth, under the "fair contemplation" test, a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under state or other nonbankruptcy law. (See *In re Cool Fuel, Inc., supra*, 210 F.3d at pp. 1006–1007; *In re Hexcel Corp.* (N.D.Cal. 1999) 239 B.R. 564, 567–570; *Signature Combs, Inc. v. U.S.* (W.D.Tenn. 2003) 253 F.Supp.2d 1028, 1037–1039.) This test originated in environmental cleanup cases. (See *In re Hexcel Corp., supra*, at p. 569.)

Although the courts do not always articulate which test is being applied, the results are generally consistent. In *Westland Oil Dev. Corp. v. MCorp Management Solutions* (S.D.Tex. 1993) 157 B.R. 100, the debtor listed two unpaid loans as liabilities but did not list as an asset its claim against the lender for breach of an oral agreement to restructure the loans. Nor did the debtor amend its schedules to include the claim. The debtor's reorganization plan was confirmed. The debtor subsequently filed suit against the lender, alleging breach of the oral agreement. The lender sought to bar the action.

In ruling for the lender, the court rejected the debtor's contention that it did not have to list the claim, stating: "[The debtor] was aware of its claim against [the lender] before it filed for bankruptcy. It is [the debtor's] belief that the actions of the [lender's] bankers forced [it] into bankruptcy. [The debtor] knew about the claim [and] was mad about it . . . . [¶] . . . A claim with potential is a potential asset. The creditors have a right to know what the debtor's assets are even though the potential may be contingent, dependent, or conditional. . . . The code requires adequate disclosure, not selective disclosure." (*Westland Oil Dev. Corp. v. MCorp Management Solutions, supra*, 157 B.R. at p. 103.)

In *In re Tennyson* (Bankr. W.D.Ky. 2004) 313 B.R. 402, the debtors in a Chapter 7 case amended their schedules to list a single cause of action against a lender based on a federal statute, stating that the only remedy sought was $2,000 in damages. After the debtors received a discharge of debts, they filed a complaint against the lender, alleging a violation of *two* federal statutes and seeking *rescission* of the loan transactions as well as the $2,000. The lender moved to dismiss the complaint on the ground of judicial estoppel. The plaintiff-debtors argued in response that they had adequately disclosed the claim by, among other things, listing the real property that was the subject of the loan.

The court dismissed the case, explaining: "While the plaintiffs did amend their schedules to include a $2,000 [statutory] claim, no mention is ever made of a possible mortgage rescission claim . . . or a [different statutory] violation. The plaintiffs would contend that the real property which is the underlying basis for the dispute between these parties was scheduled and that this was sufficient notice for the Chapter 7 trustee. This court cannot agree. The real property and the individual claims against the [lender] are distinct, separate assets. One does not subsume the other. Box twenty (20) of Schedule B specifically asks for all contingent and unliquidated claims. Every debtor in bankruptcy has an absolute obligation to schedule every asset on their bankruptcy schedules. . . . The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court. . . . This includes claims the debtor may have against mortgage lenders." (*In re Tennyson, supra*, 313 B.R. at p. 406, citations omitted.)

■ Nonbankruptcy courts, including those in California, have recognized that, in completing bankruptcy schedules, a debtor should list any legal claims against a creditor whose wrongful conduct caused the bankruptcy; otherwise, an action on the claim is barred. (See *Billmeyer, supra,* 42 Cal.App.4th at pp. 1088, 1090, 1092, 1096 [debtor failed to list legal claim against lender but subsequently filed suit on claim, alleging lender's breach of loan agreements was catalyst for bankruptcy]; *Conrad v. Bank of America, supra,* 45 Cal.App.4th at pp. 137–138, 143–145, 148, 160 [debtors failed to list legal claim against lender but alleged in postbankruptcy action that lender's fraud in refusing to make loan forced them to file for bankruptcy]; *Payless Wholesale Distrib. v. Alberto Culver* (1st Cir. 1993) 989 F.2d 570, 571 [debtor failed to list legal claim against several creditors but later sued them for conspiring to drive it out of business]; *Oneida Motor Freight, Inc. v. United Jersey Bank* (3d Cir. 1988) 848 F.2d 414, 416, 419–420 [debtor failed to list legal claim against lender but alleged in subsequent suit that lender's breach of loan agreements was reason for bankruptcy].)

In light of the foregoing, we conclude RKG was required to disclose its legal claim against Kest and the Trust in the Chapter 11 bankruptcy case. Before filing its petition, RKG knew that the Trust had breached the alleged oral agreement to fund 80 percent of the Quarry project. Indeed, Gottlieb alleges that the Trust's breach caused RKG to seek bankruptcy protection. When filing the petition, RKG could fairly contemplate the existence of its claim. The breach of the alleged agreement left RKG short of funds as of the last day to close escrow on the Quarry—the same day the petition was filed. RKG already knew about the evidence supporting its theory that the $800,000 was an investment (capital contribution), not a loan (debt). And RKG realized that obtaining alternative funding would be difficult.

It does not matter that the evidence with respect to RKG's claim may have been in conflict when the petition was filed. For instance, in the months before RKG filed under Chapter 11, the Trust had referred to the $800,000 as a loan on some occasions, as an investment on others. But certainty of success on a legal claim is not required; undisputed facts are not necessary. Rather, a debtor must list a claim, depending on the circumstances, if the wrongful conduct has already occurred, if there is a sufficient nexus between the wrongdoer's prepetition conduct and the parties' preconfirmation relationship, or if the claim's existence is fairly contemplated. (See, e.g., *In re Hassanally, supra,* 208 B.R. at pp. 50–53; *In re Cool Fuel, Inc., supra,* 210 F.3d at pp. 1006–1007; *In re Zilog, Inc.* (9th Cir. 2006) 450 F.3d 996, 999–1001.) As stated, those tests were satisfied here.

This is not to say that, upon filing its petition or while its Chapter 11 case was pending, RKG should have known and thus disclosed it would ultimately

lose profits exceeding $2 million as a result of the Trust's alleged wrongdoing. But, at a minimum, RKG should have listed its legal claim on the schedules and indicated it contested repayment of the $800,000. RKG did not have to give an exact dollar value for the claim but an "estimated value." (See United States Bankruptcy Court Official Form 6, item 21 (former item 20), reprinted in Collier on Bankruptcy, *supra*, appen. vol. A, pt. 2(d), at p. 466; *Westland Oil Dev. Corp. v. MCorp Management Solutions, supra*, 157 B.R. at p. 103.)

### 2. *Judicial Estoppel Factors*

The factors guiding the application of judicial estoppel focus on whether a party has taken totally inconsistent positions in judicial proceedings where the prior position was successfully asserted, and the inconsistency is not the result of ignorance, fraud or mistake. (See *Aguilar, supra*, 32 Cal.4th at pp. 986–987; *MW Erectors, supra*, 36 Cal.4th at p. 422.)

"Courts of various jurisdictions have held that a debtor's assertion [in a civil action] of legal claims not disclosed in earlier bankruptcy proceedings constitutes an assumption of inconsistent positions. . . . This holding stems from the requirement that a debtor seeking the shelter provided by federal bankruptcy laws disclose all legal or equitable property interests to a bankruptcy court. . . . [¶] The omission of a cause of action or claim 'from . . . mandatory bankruptcy filings is tantamount to a representation that no such claim existed.' " (*Autos, Inc. v. Gowin, supra*, 330 B.R. at p. 795, citations omitted; accord, *In re Superior Crewboats, Inc.* (5th Cir. 2004) 374 F.3d 330, 335; *Youngblood Group v. Lufkin Federal Sav. & Loan Ass'n* (E.D.Tex. 1996) 932 F.Supp. 859, 867–869.)

Here, the same party—Gottlieb—has taken totally inconsistent positions in two judicial proceedings. As RKG's managing member and majority owner, Gottlieb stated under penalty of perjury in the Chapter 11 case that RKG did not have any legal claims against anyone; in this action, Gottlieb, as RKG's assignee, seeks to recover on such a claim.

Nevertheless, one of the judicial estoppel factors—success in asserting the prior position—is not present: The bankruptcy court did not "adopt[] the [prior] position or accept[] it as true." (*Aguilar, supra*, 32 Cal.4th at p. 986; see *MW Erectors, supra*, 36 Cal.4th at p. 422.) Neither the automatic stay nor the stipulated order satisfied the success factor. And the bankruptcy case was dismissed without confirmation of a plan of reorganization. "[T]he record [should] show that . . . the bankruptcy court *accepted* the [prior position] as true and *granted relief on that basis*." (*Kolodge v. Boyd* (2001) 88 Cal.App.4th

349, 376 [105 Cal.Rptr.2d 749], italics added.) That did not happen. As we discuss in detail, judicial estoppel therefore does not apply.[3]

Several California courts have held that judicial estoppel bars an action where the plaintiff failed to disclose a legal claim in a prior bankruptcy case. (See, e.g., *International Engine Parts, Inc. v. Feddersen & Co.*, *supra*, 64 Cal.App.4th at pp. 350, 353 [accountant malpractice]; *Conrad v. Bank of America*, *supra*, 45 Cal.App.4th at pp. 137–138, 153–154 [lender liability]; *Billmeyer*, *supra*, 42 Cal.App.4th at pp. 1091–1092, 1096 [same].) Others have acknowledged the possibility of such a bar. (See, e.g., *Kelsey v. Waste Management of Alameda County* (1999) 76 Cal.App.4th 590, 598–600 [90 Cal.Rptr.2d 510] [employment discrimination]; *Haley v. Dow Lewis Motors, Inc.*, *supra*, 72 Cal.App.4th at pp. 509–511 [wrongful termination of employment]; *Cloud v. Northrop Grumman Corp.*, *supra*, 67 Cal.App.4th at pp. 998–999, 1011–1020 [wrongful termination of employment and sexual harassment].)

Judicial estoppel has also barred an action where a material allegation or assertion was inconsistent with the position taken in a prior bankruptcy case. (See, e.g., *Thomas v. Gordon* (2000) 85 Cal.App.4th 113, 117–121 [102 Cal.Rptr.2d 28] (*Thomas*) [plaintiff could not sue accountant for failing to inform her about corporations' financial affairs where she was not an officer, director, or shareholder of corporations, and her bankruptcy papers did not mention any type of interest in corporations]; *Michelson v. Camp* (1999) 72 Cal.App.4th 955, 959–961, 970–971 [85 Cal.Rptr.2d 539] [lenders could not sue real estate appraiser for appraisal made in 1991 where lenders had submitted different appraiser's 1993 appraisal to bankruptcy court in obtaining lift from stay].)

The foregoing decisions are based on principles enunciated by federal courts. (See, e.g., *Haley v. Dow Lewis Motors, Inc.*, *supra*, 72 Cal.App.4th at pp. 509–510; *Cloud v. Northrop Grumman Corp.*, *supra*, 67 Cal.App.4th at pp. 1011–1020; *Billmeyer*, *supra*, 42 Cal.App.4th at pp. 1091, 1094–1096.) Federal precedent is particularly important here given the need for uniformity in our national bankruptcy system and the concomitant desire for a consistent, predictable approach in determining the effect of exclusively federal proceedings. (See *Conrad v. Bank of America*, *supra*, 45 Cal.App.4th at pp. 149–150, 153–154.)

██ The United States Supreme Court has recognized that, in deciding whether to apply judicial estoppel, "courts regularly inquire whether the party [to be estopped] has succeeded in persuading a court to accept that party's

---

[3] We do not decide whether Gottlieb's inconsistent positions were the result of ignorance, fraud, or mistake. (See *Aguilar*, *supra*, 32 Cal.4th at pp. 986–987; *MW Erectors*, *supra*, 36 Cal.4th at p. 422.)

earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' . . . and thus poses little threat to judicial integrity." (*New Hampshire, supra*, 532 U.S. at pp. 750–751, citations omitted; accord, *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832 [30 Cal.Rptr.3d 588]; *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1246 [132 Cal.Rptr.2d 57].)

Recently, the high court held that judicial estoppel did not apply where the party to be estopped had not successfully asserted his prior position, notwithstanding that the other judicial estoppel factors, considered separately, might have supported the doctrine's application. (*Zedner v. United States* (2006) 547 U.S. ___, ___ [164 L.Ed.2d 749, 126 S.Ct. 1976, 1987–1988] (*Zedner*).) The court concluded that the other factors did not "predominate" in light of the circumstances. (*Id.* at p. ___ [126 S.Ct. at p. 1988].)

"[I]f a party's initial position was never accepted by a court or agency, then it is difficult to see how a later change manifests an 'intent to play fast and loose with the court[s].' . . . We think this insight explains why the consensus view among [the federal] circuits is that judicial estoppel is inappropriate unless the earlier position was accepted by a court or agency." (*Montrose Medical Group, supra*, 243 F.3d at p. 782, italics omitted; see *id.* at p. 782 & fn. 6 [citing cases from eight circuits]; accord, 18 Moore's Federal Practice (3d ed. 2006) § 134.33[4], p. 134-77 & fn. 10 [citing cases from first seven circuits]; *Stallings v. Hussmann Corp.* (8th Cir. 2006) 447 F.3d 1041, 1047–1049; *Hamilton v. State Farm Fire & Cas. Co.* (9th Cir. 2001) 270 F.3d 778, 783 (*Hamilton*); *Johnson v. Lindon City Corp.* (10th Cir. 2005) 405 F.3d 1065, 1069; *Water Technologies Corp. v. Calco, Ltd.* (1988) 850 F.2d 660, 665–666; see also *Konstantinidis v. Chen* (1980) 200 U.S. App. D.C. 69 [626 F.2d 933, 936, fn. 6, 938–939]; *Smith v. District of Columbia* (D.D.C. 2003) 295 F.Supp.2d 53, 55–56.)

### a. *Plan of Reorganization*

 "[W]here a chapter 11 debtor fails to list or otherwise identify a claim against a creditor during the proceedings [culminating in the] *confirmation of a reorganization plan*[,] . . . the federal courts have rejected various attempts to distinguish and/or excuse such failures." (*Conrad v. Bank of America, supra*, 45 Cal.App.4th at p. 148, italics added.) "Creditors are required to make their claims, if at all, in the bankruptcy proceeding, their consent is required for confirmation of a reorganization plan, and *upon plan*

*confirmation* they are precluded from asserting claims except to the extent and in the manner approved in the reorganization plan." (*Id.* at pp. 152–153, italics added.)

" 'The rationale for . . . decisions [invoking judicial estoppel to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy] is that the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. The courts will not permit a debtor *to obtain relief from the bankruptcy court by representing that no claims exist* and then subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and *the bankruptcy court, which must decide whether to approve the plan of reorganization* on the same basis, are impaired when the disclosure provided by the debtor is incomplete.' " (*In re Coastal Plains, Inc., supra,* 179 F.3d at p. 208, some italics added and omitted, bracketed material added in *In re Coastal Plains, Inc.*)

In cases involving the nondisclosure of legal claims in Chapter 11 proceedings, the federal courts typically apply judicial estoppel where the bankruptcy court confirmed the reorganization plan and thereby accepted the nondisclosure as true. (See, e.g., *Krystal Cadillac-Olds GMC Truck v. General Motors, supra,* 337 F.3d at p. 322; *Hay v. First Interstate Bank of Kalispell, N.A.* (9th Cir. 1992) 978 F.2d 555, 556; *Oneida Motor Freight, Inc. v. United Jersey Bank, supra,* 848 F.2d at pp. 415–420; *In re USinternetworking, Inc., supra,* 310 B.R. at pp. 277–279; see also *Richardson v. United Parcel Service* (E.D.Mo. 1996) 195 B.R. 737, 739 [declining to apply judicial estoppel, noting that "in the cases cited by defendant, the bankruptcy proceedings had concluded, plans had been confirmed, and assets had been distributed"]; *International Engine Parts, Inc. v. Feddersen & Co., supra,* 64 Cal.App.4th at pp. 348–351, 353 [applying principles of judicial estoppel derived from federal law in barring subsequent civil action where reorganization plan had been confirmed]; *Conrad v. Bank of America, supra,* 45 Cal.App.4th at pp. 142, 145–148, 153–154 [same].)

Judicial estoppel was also applied where a bankruptcy court had granted a creditor's motion to lift a stay based in part on a "lift-stay stipulation" signed by the debtor that estimated the total value of the debtor's assets ($20,000) but did not include the value of an undisclosed legal claim ($10 million). (*In re Coastal Plains, Inc., supra,* 179 F.3d at pp. 202–204, 207, 210; see *Michelson v. Camp, supra,* 72 Cal.App.4th at pp. 959–961, 970–971 [lenders could not sue real estate appraiser for appraisal made in 1991 where lenders had submitted different appraiser's 1993 appraisal to bankruptcy court in obtaining lift from stay].)

In *Hamilton, supra,* 270 F.3d 778, the Ninth Circuit addressed whether a plaintiff who had previously filed a Chapter 7 case was judicially estopped from suing a creditor where no legal claims had been listed on Schedule B, item 20. The bankruptcy court had discharged the plaintiff's debts but later vacated the discharge due to the plaintiff's lack of cooperation. The Ninth Circuit first stated, "This court has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." (*Hamilton, supra,* at p. 783.)

The court continued: "[A] discharge of debt by a bankruptcy court . . . is sufficient acceptance to provide a basis for judicial estoppel, even if the discharge is later vacated. Our holding does not imply that the bankruptcy court must actually discharge debts before the judicial acceptance prong may be satisfied. The bankruptcy court may 'accept' the debtor's assertions by relying on the debtor's nondisclosure of potential claims in many other ways." (*Hamilton, supra,* 270 F.3d at p. 784.) As examples, the court noted that "judicial acceptance was satisfied [where a] bankruptcy court lifted a stay based in part on the debtor's nondisclosure . . . in a lift-stay stipulation" (*ibid.,* citing *In re Coastal Plains, Inc., supra,* 179 F.3d at p. 210) and where a "court approved the debtor's plan of reorganization" (*Hamilton,* at p. 784, citing *Donaldson v. Bernstein* (3d Cir. 1997) 104 F.3d 547, 555–556).

As stated more recently: "[W]hile the Ninth Circuit has used sweeping language condemning 'playing fast and loose' with courts, its narrow holdings more cautiously require that the [bankruptcy] court have 'accepted' the earlier position before imposing a judicial estoppel. . . . [¶] The meaning of 'acceptance' in the bankruptcy context is construed broadly to 'protect[] the integrity of the bankruptcy process.' . . . Among other possibilities, the grant of a discharge (even if later revoked) or the confirmation of a plan may constitute sufficient 'acceptance' of the accuracy of schedules so as to permit judicial estoppel." (*In re An-Tze Cheng* (Bankr. 9th Cir. 2004) 308 B.R. 448, 453, affd. mem. (9th Cir. 2005) 160 Fed.Appx. 644, citations omitted.)

RKG did not submit a reorganization plan, creditors did not accept a plan, and the bankruptcy court did not review or confirm a plan. At no time did the bankruptcy court rely on the value of RKG's assets. And the Chapter 11 case was dismissed without a determination as to any purported debts. Such a dismissal is intended to " 'undo the bankruptcy case, as far as practicable, and restore all property rights to the position in which they were found at the commencement of the case.' " (*In re Weston* (E.D.Cal. 1989) 110 B.R. 452, 456, affd. mem. (9th Cir. 1992) 967 F.2d 596; see *In re Space Bldg. Corp.* (D.Mass. 1996) 206 B.R. 269, 273–274.) "After an order of dismissal, the debtor's debts and property are subject to the general laws, unaffected by bankruptcy concepts." (*In re Income Property Builders, Inc.* (9th Cir. 1982)

699 F.2d 963, 965.) Thus, RKG's nondisclosure of its legal claims did not affect any unpaid creditor's ability to pursue it or Gottlieb for the full amount due—as illustrated by Kest's cross-complaint. In short, Gottlieb, as RKG's assignee, did not successfully assert his prior position.

*Ryan Operations, supra,* 81 F.3d 355, is not to the contrary. There, the Third Circuit stated that the party to be estopped did not have to *benefit* from its prior position (*id.* at p. 361), suggesting that prior *success* was not a factor. But as later clarified, "*Ryan Operations* never stated that judicial estoppel could validly be applied in a case where the initial position was never accepted by a court or agency." (*Montrose Medical Group, supra,* 243 F.3d at p. 783, italics added.) In fact, "the inconsistent 'statement' in *Ryan Operations* had been accepted by [the bankruptcy] court . . . when it approved the plan of reorganization." (*Montrose Medical Group, supra,* 243 F.3d at p. 783, fn. 8.) The language in *Ryan Operations* notwithstanding, the success factor is still applied in the Third Circuit. (See, e.g., *U.S. v. Pelullo* (3d Cir. 2005) 399 F.3d 197, 222–223; *Montrose Medical Group, supra,* 243 F.3d at pp. 779–782; *In re DVI, Inc.* (Bankr. D.Del. 2005) 326 B.R. 301, 308.)

### b. *Stipulated Order*

Nor did the stipulated order adopt or accept RKG's position that it had no legal claims. The bankruptcy court simply approved an agreement between Nevada Ready Mix and RKG that established procedural deadlines in the bankruptcy case and terminated RKG's interests in the Quarry if any deadlines were missed. Nothing in the order referenced RKG's other assets, disclosed or undisclosed, or the value of RKG's assets.

In that regard, Kest's reliance on *Billmeyer, supra,* 42 Cal.App.4th 1086, is misplaced. The court in *Billmeyer* did not address whether a stipulated order may constitute success for purposes of judicial estoppel; it discussed whether a lift-stay order was a *final judgment* in applying *res judicata.* (*Id.* at p. 1093 & fns. 4, 5.) And, in any event, the order in *Billmeyer* was "comprehensive" (*id.* at p. 1093); it disposed of *all* of the debtor's prepetition property, including the undisclosed legal claim, giving it all to the creditor. (*Ibid.*) Thus, the debtor brought suit on a claim he no longer owned. Here, the stipulated order concerned only RKG's interests in the real property owned by Nevada Ready Mix; it did not involve the undisclosed legal claim against the Trust or the Trust's $800,000 claim against RKG.

### c. *Automatic Stay*

The automatic stay cannot be deemed an adoption or acceptance of RKG's prior position because it was not premised even in part on RKG's nondisclosure of the legal claim. This follows from the nature of the stay: "The

automatic stay is one of the most vital protections of the bankruptcy system. . . . The stay protects debtors, as well as creditors, by providing debtors 'a breathing spell' from collection efforts and promoting 'orderly and fair' distribution among creditors. . . . Without the protections of the automatic stay, creditors would engage in a race to collect from a debtor before a decision could be made by a bankruptcy court. The result would be an impoverished debtor and a system that rewarded the fastest, but not necessarily the most deserving, creditors.

"If the automatic stay were not in fact 'automatic' upon the filing of a petition, but instead relied on a decision of a bankruptcy court as to the merits of the debtor's petition, the race to collect . . . could still occur. Under the [lower] court's analysis of the automatic stay[, to the effect that no automatic stay ever existed because the debtor was not entitled to any relief on the merits,] no party would be certain that the debtor is deserving of the protections of the stay until a court rules on the merits of the petition. The burden would be on the debtor to petition the court and prove his eligibility under the chapter in which he filed. Until the debtor acted, creditors could claim ignorance as to the debtor's eligibility and act to collect on their claims in hopes that the bankruptcy court would find no merit in the debtor's petition." (*Shaw v. Ehrlich* (W.D.Va. 2003) 294 B.R. 260, 267–268, affd. mem. *sub nom. In re Wiencko* (4th Cir. 2004) 99 Fed.Appx. 466, citations and fn. omitted.) Consequently, "the automatic stay comes into existence immediately and automatically regardless of the merits of a petition filed by a debtor." (*Id.* at p. 269.)

As the Ninth Circuit explained: "Under the Bankruptcy Code, *when a debtor files his petition* for bankruptcy, he receives the benefit of an *automatic stay* that is imposed on his creditors, . . . preventing them from proceeding to collect on their claims. . . . Under Chapter 11, the stay is also intended to give the debtor time to reorganize his assets in order to rehabilitate his business. . . .

"In certain cases, however, the stay may work an inequity on creditors. If so, the creditor may obtain *relief from the stay* under 11 U.S.C. § 362(d) (1982). Such relief is granted (1) for cause, including lack of adequate protection of a creditor's security interest in collateral; or (2) when the debtor has no equity in the collateral and the collateral will not help the debtor to reorganize effectively or rehabilitate his business. . . . The *debtor's lack of good faith in filing a bankruptcy petition* has often been used as cause for *removing the automatic stay.*" (*In re Arnold* (9th Cir. 1986) 806 F.2d 937, 939, citations omitted, italics added.)

"Where a debtor seeks protection of the Bankruptcy Code, creditors may legitimately expect the debtor, at a minimum, to abide by provisions of the Code. When *debtors flout the code*, they lose their protection from creditors and *relief from the automatic stay* will be granted." (*In re Knight Jewelry* (Bankr. W.D.Mo. 1994) 168 B.R. 199, 202, italics added.) Simply put, RKG was entitled to an automatic stay regardless of whether it disclosed its legal claim.

In *Hamilton, supra,* 270 F.3d 778, the Ninth Circuit, in discussing whether an automatic stay *by itself* constitutes success for purposes of judicial estoppel, concluded that the debtor there had successfully asserted his prior position because he "enjoy[ed] the benefit of *both* an automatic stay *and* a discharge of debt in his Chapter 7 bankruptcy proceeding." (*Hamilton, supra,* at p. 785, italics added.) The court also stated that success would be shown where, for example, a bankruptcy court had relied on the nondisclosure of a legal claim in deciding whether to *lift* a stay or *confirm* a reorganization plan. (*Id.* at p. 784.) These examples would make little sense if an automatic stay *alone* were deemed success.

As one court explained: "[The plaintiff], instead of amending her bankruptcy case to reflect the [legal] claims she now brings, dismissed the bankruptcy. If . . . judicial estoppel would be defeated had [the plaintiff] amended her bankruptcy schedules, then it is certainly defeated by her dismissal of the bankruptcy outright. [¶] [The defendant] asserts that, although [the plaintiff's] bankruptcy was dismissed, she nonetheless benefitted from it through the automatic stay on collection activity, and that benefit is an 'inequity' that judicial estoppel should bar. It is true that a benefit sufficient to trigger judicial estoppel does not have to involve full discharge of a party's debts. . . .

"To be sure, [the plaintiff] derived the benefit of an automatic stay as a result of her bankruptcy petition; however, that benefit existed irrespective of the claims she listed (or failed to list) in her filings. In this case, the automatic benefit of a stay on collection action prior to dismissal of a bankruptcy case is not a benefit that threatens judicial integrity in a way sufficient to provide a basis for judicial estoppel." (*Spann v. DynCorp Technical Services, LLC, supra,* 403 F.Supp.2d at p. 1089.)

As the Eighth Circuit recently recognized, where a debtor fails to disclose legal claims on its bankruptcy schedules, and the bankruptcy case is dismissed without a discharge of debts, the debtor has not *successfully* asserted its position for purposes of judicial estoppel. In other words, the bankruptcy court did not adopt or accept the truth of the debtor's nondisclosure. (See *Stallings v. Hussmann Corp., supra,* 447 F.3d at pp. 1045, 1047–1049.) The same is true here.

The only success RKG arguably achieved in the Chapter 11 case was a four-month postponement of its loss of the Quarry project. RKG stood to lose the project the day it filed the bankruptcy petition, having failed to close escrow before then. RKG did not derive an "unfair advantage" from the nondisclosure of its legal claim. (See *New Hampshire, supra*, 532 U.S. at p. 751.)

For their part, Kest and the Trust complain they incurred an "unfair detriment" as a result of the bankruptcy case. (See *New Hampshire, supra*, 532 U.S. at p. 751.) More specifically, if RKG had disclosed its legal claim, then Kest, according to his declaration, would have sought to have the claim resolved in the bankruptcy court "while the evidence was still fresh," and he would have "proceeded differently regarding the Quarry project."

But Kest's assertions are too conclusory to make a showing of detriment. He does not say in what *particulars*, if .any, the evidence may have become stale or *how* he would have acted differently. In applying an equitable doctrine like judicial estoppel, we will not presume detriment from the mere passage of time. (See *Piscioneri v. City of Ontario* (2002) 95 Cal.App.4th 1037, 1046, 1049–1050 [116 Cal.Rptr.2d 38]; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 419, p. 528.) And if the inability to have RKG's legal claim resolved in bankruptcy court were sufficient to constitute detriment, judicial estoppel would apply in *every* case of nondisclosure, which is not the law. (See, e.g., *Stallings v. Hussmann Corp., supra*, 447 F.3d at pp. 1046–1049; *Spann v. DynCorp Technical Services, LLC, supra*, 403 F.Supp.2d at pp. 1086–1089.)[4]

In sum, judicial estoppel is an extraordinary remedy that should rarely apply to positions taken in Chapter 11 cases absent evidence that the bankruptcy court adopted or accepted the truth of the debtor's position. The doctrine is most appropriate " '[w]here a party assumes a [prior] position in a legal proceeding, and *succeeds* in maintaining that position.' " (*New Hampshire, supra*, 532 U.S. at p. 749, italics added.)

Although RKG failed to disclose its legal claim on the bankruptcy schedules, the bankruptcy court did not adopt or accept the truth of the nondisclosure and was not misled by it. RKG's creditors were not harmed by the bankruptcy case because it was dismissed without confirmation of a reorganization plan. They remain able to pursue RKG and Gottlieb for the full payment of any debts.

---

[4] For the same reasons, we reject Kest's contention that this action is barred by *equitable* estoppel. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 794 [72 Cal.Rptr.2d 624, 952 P.2d 641] [equitable estoppel requires detrimental reliance].)

Gottlieb's conduct, such as it was, "introduces no 'risk of inconsistent court determinations,' . . . and thus poses little threat to judicial integrity." (*New Hampshire, supra*, 532 U.S. at p. 751, citation omitted.) There will be no " 'perversion of the judicial process.' " (*Id.* at p. 750; see *Jackson, supra*, 60 Cal.App.4th at p. 183.) Here, the debtor did not " '[c]onceal [its] claims; get rid of [its] creditors on the cheap, and start over with a bundle of rights.' " (*In re Superior Crewboats, Inc., supra*, 374 F.3d at p. 336.)[5]

We are not persuaded otherwise by *Thomas, supra*, 85 Cal.App.4th 113. There, the plaintiff, a physician, established two corporations that would be funded almost entirely by her medical practice and managed by her paramour. The plaintiff was not an officer, director, or shareholder of either corporation. The admitted purpose of this arrangement was to shelter plaintiff's income from creditors. The plaintiff retained the defendant, an accountant, to advise her with respect to the creation and operation of the corporations. Later, the plaintiff filed two bankruptcy petitions in which her schedules and statements of financial affairs did not mention any type of interest in the corporations. She amended the schedules once but again failed to list any such interest. Her bankruptcy petitions were ultimately dismissed.

After the corporations ceased doing business, the plaintiff sued the accountant, alleging he had not properly advised her about corporate matters. The accountant moved for summary judgment on the ground of judicial estoppel. The trial court granted the motion. The Court of Appeal affirmed, stating the plaintiff's bankruptcy papers indicated she had no interest in either corporation. Thus, the accountant owed her no duty of care. (*Thomas, supra*, 85 Cal.App.4th at pp. 120–121.)

The *Thomas* court also addressed the factor of success, explaining: "[T]here is no hard and fast rule which limits application of the doctrine to those situations where the litigant was successful in asserting the contradictory position. . . . [¶] We believe that this is a situation which warrants application of the doctrine of judicial estoppel even absent proof of success in the earlier litigation. [The plaintiff] brazenly admits that she transferred her most valuable asset—her income stream—to a corporation owned wholly by her paramour in order to keep it out of the hands of her creditors. She then filed for bankruptcy, clearly expecting to reclaim her funds from her trusted friend after all of her lawful debts were discharged. Not once, but three times, she signed documents under oath for filing with the bankruptcy court which

---

[5] Our analysis similarly applies to Kest's assertion that RKG's schedules and statement of financial affairs contained other inconsistent positions. For instance, RKG allegedly should have stated it had a partnership with the Trust, it transferred a security interest to the Trust, it had accounts receivable due from the Trust, it had an executory contract with the Trust, and it held or controlled property owned by another person.)

claimed to list all of her assets but said nothing about any interest in [the corporations] or the funds she allegedly believed were being held for her there. Assuming that the doctrine of judicial estoppel should be applied to an *unsuccessful* litigant only in the *rare situation* where the litigant has made an *egregious* attempt to manipulate the legal system, we agree with the trial court that '*this is as egregious as it gets* . . . .' " (*Thomas, supra,* 85 Cal.App.4th at pp. 118–119, italics added.)

*Thomas,* unlike the present case, involved a brazen admission of such egregious misconduct that it presented a rare situation where judicial estoppel should be applied even though the bankruptcy court did not rely on the debtor's nondisclosures. (See *Jackson, supra,* 60 Cal.App.4th at p. 183, fn. 8; *Drain v. Betz Laboratories, Inc.* (1999) 69 Cal.App.4th 950, 957–959 [81 Cal.Rptr.2d 864], citing *Jackson, supra,* at p. 183, fn. 8.) And *Thomas* was decided before the Supreme Court emphasized the importance of the success factor in *New Hampshire, supra,* 532 U.S. at pages 749–751, and *Zedner, supra,* 547 U.S. at pages ___ [126 S.Ct. at pp. 1987–1988]. In any event, the *Thomas* court went on to say in dicta that the plaintiff had *actually achieved success* by way of obtaining the automatic stay. (See *Thomas, supra,* 85 Cal.App.4th at pp. 119–120.) We decline to follow the *Thomas* dicta for the reasons already discussed.

Accordingly, the trial court erred in concluding that judicial estoppel barred the complaint. We reverse the summary judgment.

### B. *Motion for Judgment on the Pleadings (Collateral Estoppel)*

██ A cross-complainant is entitled to judgment on the pleadings if the cross-complaint "states facts sufficient to constitute a cause or causes of action against the [cross-]defendant and the answer does not state facts sufficient to constitute a defense to the [cross-]complaint." (Code Civ. Proc., § 438, subd. (c)(1)(A); see *id.,* subd. (a)(1)–(3).) The grounds for a motion for judgment on the pleadings "shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (*Id.,* subd. (d); see *Barker v. Hull* (1987) 191 Cal.App.3d 221 [236 Cal.Rptr. 285] [trial court properly applied collateral estoppel in granting motion for judgment on the pleadings].) We review the trial court's decision de novo. (*Wise v. Pacific Gas & Electric Co.* (2005) 132 Cal.App.4th 725, 738 [34 Cal.Rptr.3d 222].)

### 1. *Elements of Collateral Estoppel*

██ "Collateral estoppel is one aspect of the broader doctrine of res judicata. [Citation.] 'Where res judicata operates to prevent relitigation of a cause of

action once adjudicated, collateral estoppel operates . . . to obviate the need to relitigate issues already adjudicated in the first action. [Citation.] The purposes of the doctrine are said to be "to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, [and] to protect against vexatious litigation." ' " (*Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 878 [128 Cal.Rptr.2d 808].)

" 'Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding "if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding]." [¶] It is implicit in this three-prong test that only issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. . . . An issue is actually litigated "[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . ." ' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1240 [32 Cal.Rptr.3d 838, 117 P.3d 544], italics omitted.) Courts also consider whether the party to be estopped had a "full and fair opportunity" to litigate the issue. (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 90 [38 Cal.Rptr.3d 528] (*Rodgers*).)

Kest seeks to establish Gottlieb's individual liability on the fraud claims by applying collateral estoppel to the default judgment entered against RKG and RKG Inc. He thus argues that Gottlieb is bound by an earlier decision in the *same* action. But the various formulations of collateral estoppel almost invariably refer to a *"prior"* or *"former"* action, proceeding, or litigation. (See, e.g., *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040]; *People v. Carter, supra,* 36 Cal.4th at p. 1240; *Modesto City Schools v. Education Audits Appeal Panel* (2004) 123 Cal.App.4th 1365, 1379 [20 Cal.Rptr.3d 831]; *Syufy Enterprises v. City of Oakland, supra,* 104 Cal.App.4th at p. 878; *Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1069–1070 [71 Cal.Rptr.2d 77] (*Citizens for Open Access*).) Unlike RKG and RKG Inc., Gottlieb filed an answer to the cross-complaint. Yet, the effect of Kest's argument is to render the answer a legal nullity and to treat Gottlieb as if he defaulted too. Nevertheless, for purposes of our analysis, we will view the default judgment as if it had been rendered in a prior action.

It might also seem that collateral estoppel would not apply here because, with respect to a default judgment, nothing is "actually litigated." That is the majority view. (See *In re Ansari* (4th Cir. 1997) 113 F.3d 17, 22; *Matter of*

*McMillan* (3d Cir. 1978) 579 F.2d 289, 292–293; *Artmatic USA Cosmetics v. Maybelline Co.* (E.D.N.Y. 1995) 906 F.Supp. 850, 856.)

■ California, on the other hand, accords collateral estoppel effect to default judgments, at least where the judgment contains an express finding on the allegations. (See *People v. Sims* (1982) 32 Cal.3d 468, 477–481 [186 Cal.Rptr. 77, 651 P.2d 321], superseded by statute on another point as stated in *Gikas v. Zolin* (1993) 6 Cal.4th 841, 851 [25 Cal.Rptr.2d 500, 863 P.2d 745]; *Estate of Williams* (1950) 36 Cal.2d 289, 293–298 [223 P.2d 248]; *English v. English* (1937) 9 Cal.2d 358, 363–364 [70 P.2d 625]; *In re Cantrell* (9th Cir. 2003) 329 F.3d 1119, 1123–1124 [applying California law].) It has also been said: " '[A] default judgment conclusively establishes, between the parties so far as subsequent proceedings on a different cause of action are concerned, the truth of all material allegations contained in the complaint in the first action, and every fact necessary to uphold the default judgment; but such judgment is not conclusive as to any defense or issue which was not raised and is not necessary to uphold the judgment.' " (*Four Star Electric, Inc. v. F & H Construction* (1992) 7 Cal.App.4th 1375, 1380 [10 Cal.Rptr.2d 1]; accord, *Mitchell v. Jones* (1959) 172 Cal.App.2d 580, 584–587 [342 P.2d 503].)

In this case, the default judgment contained express "findings" that Gottlieb personally engaged in fraud. The companies' liability was expressly based on Gottlieb's conduct. The material allegations of the cross-complaint included the specific acts Gottlieb allegedly committed. And the "facts" concerning Gottlieb's wrongdoing are necessary to uphold the default judgment. Thus, the issue of Gottlieb's personal fraud was necessarily decided in entering the default judgment and is identical to the issue he now seeks to litigate. Also, the default judgment is final.

### 2. *Privity*

■ "The concept of privity . . . refers 'to a mutual or successive relationship to the same rights of property, or to such an *identification in interest* of one person with another as to represent the same legal rights . . . and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' " (*Citizens for Open Access, supra*, 60 Cal.App.4th at pp. 1069–1070, citation omitted, italics added; accord, *Rodgers, supra*, 136 Cal.App.4th at pp. 90–91.)

"In the final analysis, the determination of privity depends upon the fairness of binding [a party to the present proceeding] with the result obtained in earlier proceedings in which it did not participate. . . . ' "Whether someone

is in privity with the actual parties requires close examination of the circumstances of each case." ' " (*Citizens for Open Access, supra,* 60 Cal.App.4th at p. 1070, citation omitted; accord, *Rodgers, supra,* 136 Cal.App.4th at p. 91.)

" ' "This requirement of identity of parties or privity is a requirement of due process of law." . . . "Due process requires that the nonparty have had an *identity or community of interest* with, and adequate representation by, the . . . party in the first action." ' " (*Citizens for Open Access, supra,* 60 Cal.App.4th at p. 1070, citation omitted, italics added; accord, *Rodgers, supra,* 136 Cal.App.4th at pp. 91, 92.)

 "A party is adequately represented for purposes of the privity rule 'if his or her *interests are so similar* to a party's interest that the latter was the former's virtual representative in the earlier action. . . .' . . . We measure the adequacy of 'representation by inference, examining whether the . . . party in the suit which is asserted to have a preclusive effect had the *same interest* as the party to be precluded, and whether that . . . party had a *strong motive* to assert that interest. If the interests of the parties in question are likely to have been *divergent,* one does not infer adequate representation and there is no privity. . . . If the . . . party's *motive* for asserting a common interest is *relatively weak,* one does not infer adequate representation and there is no privity.' " (*Citizens for Open Access, supra,* 60 Cal.App.4th at pp. 1070–1071, citations omitted, italics added.)

Kest seeks to use collateral estoppel "offensively"—to preclude a defendant (or cross-defendant) from relitigating an issue he previously litigated and lost. (See *Roos v. Red* (2005) 130 Cal.App.4th 870, 880 [30 Cal.Rptr.3d 446].) In this situation, "the courts have recognized that certain circumstances exist that so undermine the confidence in the validity of the prior proceeding that the application of collateral estoppel would be 'unfair' to the defendant as a matter of law. . . . Such 'unfair' circumstances include a situation where the defendant had *no incentive to vigorously litigate* the issue in the prior action . . . ." (*Ibid.,* citation omitted, italics added.)

 Generally, "a corporation is a distinct legal entity, separate from its shareholders and officers. The rights and liabilities of corporations are distinct from the persons composing it." (*Clean Air Transport Systems v. San Mateo County Transit Dist.* (1988) 198 Cal.App.3d 576, 578 [243 Cal.Rptr. 799]; accord, *Robbins v. Blecher* (1997) 52 Cal.App.4th 886, 892 [60 Cal.Rptr.2d 815].) According to the Restatement Second of Judgments (Restatement): "The concept that a corporation is a legal entity distinct from its management and stockholders implies that issues determined against a corporation are not conclusive against its directors, officers, and stockholders, and vice versa.

Such a rule is appropriate with regard to a corporation whose ownership is widely held. In such a corporation, the directors and officers are charged with a fiduciary obligation to manage the corporation's affairs, including the conduct of litigation . . . . In a corporation whose management is a complex organization, moreover, many or all of the officers and directors often have such a remote connection with specific litigation that they cannot be said to have participated in it beyond assuming official responsibility on behalf of the corporation. To hold them bound by determinations in litigation to which the corporation is a party would in effect deny them their own day in court. The same is true of stockholders or members of such a corporation." (Rest.2d Judgments, § 59, com. e, p. 98.)

But the Restatement notes an exception for corporations that are closely held: "If the corporation is closely held, in that *one or a few persons hold substantially the entire ownership in it*, the judgment in an action . . . against the corporation or the holder of ownership in it is conclusive upon the other of them as to issues determined therein as follows: [¶] . . . The judgment in an action . . . against the corporation is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, *unless his interests and those of the corporation are so different that he should have [an] opportunity to relitigate the issue.*" (Rest.2d Judgments, § 59(3)(a), p. 94, italics added; accord, 9A Fletcher Cyclopedia of the Law of Private Corporations (2000 rev.) § 4705, p. 484.)

As explained in the commentary to the Restatement: "When the corporation is closely held, . . . [the] *interests* of the corporation's management and stockholders and the corporation itself *generally fully coincide*. By definition, the stockholders are few in number and either themselves constitute the management or have direct personal control over it. In many respects, the enterprise is a proprietorship or partnership conducted in corporate form. If the corporate form . . . is adequately adhered to, the fact that interests of a closely held corporation and its proprietors are usually identical does not efface the separate legal identity of the corporation for such purposes as taxation, regulation, and the limitation of stockholders' liability to their investment in the corporation. For the purpose of affording opportunity for a day in court on issues contested in litigation, however, there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct. On the contrary, it may be *presumed that their interests coincide* and that one opportunity to litigate issues that concern them in common should sufficiently protect both.

"The problem then becomes one of fair opportunity to litigate the issue in question. When the corporation is the party to the litigation, a controlling owner who participates in the conduct of the litigation ordinarily has full

opportunity and *adequate incentive* to litigate issues commonly affecting him and the corporation." (Rest.2d Judgments, § 59, com. e, pp. 99–100, italics added, followed in *Alaska Foods Inc. v. Nichiro Gyogyo Kaisha* (Alaska 1989) 768 P.2d 117, 122–124; *Joe's Pizza, Inc. v. Aetna Life & Casualty Co.* (1996) 236 Conn. 863, 868–870 & fn. 11 [675 A.2d 441, 444–445 & fn. 11]; *Bartle v. Health Quest Realty VII* (Ind.Ct.App. 2002) 768 N.E.2d 912, 918–921 & fn. 4; *Missouri Mexican Products v. Dunafon* (Mo.Ct.App. 1994) 873 S.W.2d 282, 286–287.)[6]

Thus, by examining the interests of Gottlieb, RKG, and RKG Inc. as well as Gottlieb's motive and incentive to provide a defense for the companies, we ultimately decide whether the companies adequately represented him. As we now discuss, the answer is no.

In *NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772 [256 Cal.Rptr. 441] (*NEC Electronics*), the plaintiff brought suit against a corporation, Ph Components (Ph), which filed an answer to the complaint but did not otherwise defend. After a short trial, at which Ph did not appear, judgment was entered for the plaintiff. Ph filed for bankruptcy under Chapter 11. The plaintiff moved to amend the judgment to name Ph's sole shareholder and chief executive officer, Porter Hurt, as an additional judgment debtor, contending he was Ph's alter ego. (See *NEC Electronics*, at pp. 776, 778 [discussing use of Code Civ. Proc., § 187 to add judgment debtors].) The trial court granted the motion.

The Court of Appeal reversed. Although the evidence was sufficient to establish Hurt's alter ego liability, the court held that his interests were not adequately represented, stating: "In [cases permitting alter ego amendments], the underlying action was contested and therefore the alter ego's interests were effectively represented by the defense presented by the corporate defendant. By contrast, in *Motores* [*De Mexicali v. Superior Court* (1958) 51 Cal.2d 172 [331 P.2d 1] (*Motores*)], where the judgment was obtained by default, the court stressed that the alter ego's interests were not represented in the underlying action and also emphasized that adding them as additional judgment debtors would violate due process. We believe that *Motores* should control the result here. Ph did not appear at trial and did not make any

---

[6] RKG is a limited liability company, not a corporation. The parties offer no reason for treating RKG differently than a corporation in this context. (See *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1211–1216 [29 Cal.Rptr.3d 193] [discussing personal liability of members and managers of limited liability companies]; *Purcell v. Southern Hills Investments, LLC* (Ind.Ct.App. 2006) 847 N.E.2d 991, 996–997 [common law fiduciary duties similar to ones imposed on closely held corporations apply to limited liability companies]; *Maxemus Entertainment, LLC v. Josey* (Super.Ct. 2003) 35 Conn.L.Rptr. 454, p.*3 & fn. 4 [applying Rest.2d Judgments, § 59(3)(a) to limited liability companies].)

attempt to defend the . . . lawsuit. As a consequence, we do not believe that Hurt's interests were represented in the underlying action.

"[A]mendment is also improper in this case because Ph's interests and Hurt's interests were not the same. The evidence reveals that Ph believed it had a defense to the . . . action but nevertheless let the matter proceed uncontested because it planned to file a chapter 11 bankruptcy petition. Ph, having been sued in its corporate capacity, simply had no incentive to defend the . . . lawsuit because Ph was on the verge of bankruptcy. This situation contrasts with the usual scenario where the interests of the corporate defendant and its alter ego are similar so that the trial strategy of the corporate defendant effectively represents the interests of the alter ego. [The plaintiff's] argument that Hurt had an opportunity to present a defense in the original action ignores these realities." (*NEC Electronics, supra,* 208 Cal.App.3d at p. 780.)

In *Katzir's Floor and Home Design v. M-MLS.com* (9th Cir. 2004) 394 F.3d 1143, the plaintiff sought to amend a default judgment to add a defendant corporation's president and sole shareholder as a judgment debtor. The district court permitted the amendment based on alter ego analysis. The Ninth Circuit, relying on *NEC Electronics* and *Motores,* reversed, stating that the interests of the president and the corporation were different because the corporation was facing financial difficulties and was about to be placed into involuntary receivership. (*Id.* at p. 1150.)

In *Hikita v. Nichiro Gyogyo Kaisha, Ltd.* (Alaska 2000) 12 P.3d 1169 (*Hikita*), the Alaska Supreme Court held that a prior judgment against a corporation did not have collateral estoppel effect on a shareholder where, at the time of the prior action, the corporation was insolvent and had more than $3.5 million in outstanding judgments against it. Applying the Restatement principles governing closely held corporations, the court stated that collateral estoppel would apply if (1) a stockholder actively participated in the corporation's litigation, and (2) the stockholder had an adequate incentive to pursue the litigation. (*Id.* at p. 1177; see *id.* at pp. 1174, 1176–1177 [discussing Rest.2d Judgments, § 59(3)(a)].) The court also cited *NEC Electronics* with approval for the proposition that "the interests of a sole shareholder of a corporation did not align with the corporation because the corporation was on the verge of bankruptcy and therefore had no incentive to litigate." (*Id.* at p. 1178, fn. 30.)

Here, RKG and RKG Inc. could not afford counsel and had no assets. They were created for the purpose of acquiring and managing the Quarry project. With the loss of the project, they ceased operations. Thus, Gottlieb had no motive or incentive to defend the claims against them, and the companies did not adequately represent his interests.

Kest emphasizes that the companies have not sued Gottlieb for indemnification. That is of no moment. The companies could not afford counsel for *any* litigation, and Gottlieb could not be expected to finance a lawsuit against himself. Nor is it significant that Gottlieb tried to protect the companies through bankruptcy filings. His effort to salvage the companies does not mean he shared their lack of interest in defending the cross-complaint.

Kest argues that Gottlieb and RKG had identical interests in light of the Beverly-Killea Limited Liability Company Act (Act) (Corp. Code, § 17000 et seq.) because RKG assigned its assets to him. Kest relies specifically on Corporations Code section 17355, subdivision (a)(1)(B), which provides: "Causes of action against a dissolved limited liability company . . . may be enforced against . . . [¶] . . . [¶] . . . members of the dissolved limited liability company to the extent of the limited liability company assets distributed to them upon dissolution of the limited liability company."

This argument has three flaws. First, Kest has not established that RKG was ever dissolved. (See Corp. Code, § 17350.) Second, there is no evidence that the assets assigned to Gottlieb—apart from the legal claim against Kest and the Trust—have any value, much less a value of $800,000 (plus interest), the amount of the default judgment. Third, the Act simply creates an enforcement mechanism so that company liabilities can be recovered out of distributed assets; it "compel[s] [a member] to *return* distributed assets." (*Id.*, § 17355, subd. (a)(1)(B), 2d par., italics added.) The Act does not permit a court to declare a member personally liable for fraud based solely on a judgment against the company. (*Id.*, § 17355, subds. (a)(3), (b).)

Kest also asserts Gottlieb and RKG had sufficiently similar interests because they were jointly and severally liable on the Trust's loans. But where liability is joint and several, a civil action against one obligor poses no risk to the others. (See *Tavery v. U.S.* (10th Cir. 1990) 897 F.2d 1032, 1033 ["claims against joint obligors are generally regarded as separate and distinct for res judicata purposes"]; *Kroh v. Commissioner* (1992) 98 T.C. 383, 391, 398–401 [husband and wife who file joint tax returns are not in privity because tax liability is joint and several]; *Williams v. Reed* (1957) 48 Cal.2d 57, 64–65 [307 P.2d 353] [judgment against one of several obligors is not a bar to an action against remaining obligors]; Rest.2d Judgments, § 49, com. b, p. 36 [plaintiff may bring separate actions against co-obligors on contract but *plaintiff* is bound by issues determined in first action]; see also 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 66, p. 137 ["If an action is brought or judgment rendered against less than all [wrongdoers], the entry of judgment alone is not res judicata with respect to the liability of the others"]; *Knowles v. Tehachapi Valley Hospital Dist.* (1996) 49 Cal.App.4th 1083, 1090 [57 Cal.Rptr.2d 192] [same].)

Next, Kest contends Gottlieb had an adequate incentive to defend the companies because, as an attorney, he might face disciplinary action by the State Bar of Illinois for engaging in fraudulent conduct. But Illinois courts appear to accord no collateral estoppel effect to a default judgment. (See *S & S Automotive v. Checker Taxi Co.* (1988) 166 Ill.App.3d 6, 8–10 [520 N.E.2d 929, 930, 117 Ill.Dec. 578].) And if Kest were correct, attorneys would be forced to appear in every action or proceeding where their reputation, character, or conduct was questioned. In any event, because Kest does not support his contention with any authority, we consider it purely speculative and do not consider it further. (See *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237–238 [118 Cal.Rptr.2d 313].)

Finally, Kest claims Gottlieb had a sufficient incentive to defend the companies because their liability was vicariously based on his conduct. As Kest sees it, a default judgment against the companies implicated Gottlieb individually, so Gottlieb should have defended them. But this theory begs the question. It posits that collateral estoppel *actually* applies because Gottlieb *should have believed it would apply*, thus providing him with an adequate incentive to litigate his individual liability through the companies.

In *Hikita, supra,* 12 P.3d 1169, the Alaska Supreme Court rejected this argument, stating: "[The defendant] nevertheless offers the theory that [the plaintiff] should have been motivated by the incentive of avoiding [collateral estoppel] . . . . But [the defendant's] reasoning is circular and would nullify the second requirement of Restatement § 59(3)(a). . . . [Collateral estoppel] will apply under [the] Restatement . . . if: (1) a stockholder was an active participant in [a closely held] corporation's litigation; and (2) if the stockholder had adequate incentive to pursue the corporation's claims. If the risk of [collateral estoppel] were itself a sufficient incentive to bind a close corporation's shareholders to actions they participated in on their corporation's behalf, then their active participation would always trigger issue preclusion. Thus, [the defendant's] approach is inherently inconsistent with § 59(3)(a)'s requirement that a stockholder be an active participant *and* have adequate incentive." (*Hikita, supra,* 12 P.3d at p. 1177, italics in original, fn. omitted.) As stated, Gottlieb had no such incentive because of RKG's and RKG Inc.'s financial condition.

Indeed, Kest's entire approach to the collateral estoppel question appears inconsistent with the general rule in California that, as between a principal and its agent, a default judgment against the principal cannot be based on respondeat superior if the agent, who does not default, subsequently prevails. (See *Adams Mfg. & Engineering Co. v. Coast Centerless Grinding*

*Co.* (1960) 184 Cal.App.2d 649, 655–656 [7 Cal.Rptr. 761]; 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 111, pp. 520–521.) Gottlieb, who did not default, was never given a meaningful opportunity to prevail.

In closing, due process requires that " 'the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.' " (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 299 [17 Cal.Rptr.3d 26].) "The 'reasonable expectation' requirement is satisfied if the party to be estopped had a proprietary [or financial] interest in and control of the prior action, or if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for the party to be estopped." (*Lewis v. County of Sacramento* (1990) 218 Cal.App.3d 214, 218 [266 Cal.Rptr. 678]; accord, *Rodgers, supra,* 136 Cal.App.4th at p. 92; *Lynch v. Glass* (1975) 44 Cal.App.3d 943, 949 [119 Cal.Rptr. 139]; see Code Civ. Proc., § 1908, subd. (b).)

Gottlieb could not have reasonably expected to be bound by the default judgment entered against his legally distinct companies, especially given that his interests diverged from theirs. After all, he filed an answer; they did not. Gottlieb did not have the requisite proprietary or financial interest in defending the claims against the defunct companies, and the companies cannot be fairly treated as having represented him.

We also question the wisdom of a rule that would force a shareholder personally to bear the cost of retaining counsel for a corporation when he is allowed to appear in propria persona, as Gottlieb briefly did during the proceedings on the cross-complaint. (See *Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1284, fn. 5 [111 Cal.Rptr.2d 439] [corporation must be represented by counsel]; *Baba v. Board of Supervisors* (2004) 124 Cal.App.4th 504, 522–526 [21 Cal.Rptr.3d 428] [individual has right to self-representation in state civil proceedings].) But that is the effect of the trial court's ruling: Because Gottlieb did not personally undertake the defense of his judgment-proof companies, he is saddled with individual liability under the default judgment entered against them.

We therefore conclude Gottlieb was not in privity with the companies, and collateral estoppel does not apply. The motion for judgment on the pleadings was improperly granted. The resulting judgment is reversed.

## III

## DISPOSITION

The summary judgment and the judgment on the pleadings are reversed. Appellant is entitled to costs on appeal.

Spencer, P. J., and Rothschild, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 11, 2006, S145980.